**Eric Vaughn SCHULTZE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–02–00210–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 13, 2005.

Discretionary Review Refused Oct. 5, 2005.

---

1. The Honorable James York, judge of the 246th District Court of Harris County, Texas.

Murry B. Cohen, Akin Gump Strauss Hauer & Feld LLP, Houston, TX, for Appellant.

Douglas Howell, III, Assistant District Attorney, Bill R. Turner, District Attorney, Bryan, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and HANKS.

## OPINION ON MOTION FOR REHEARING

GEORGE C. HANKS, JR., Justice.

We withdraw our Opinion of May 13, 2004 and issue the following Opinion in its stead. We deny appellant's motion for rehearing.

Appellant, Eric Vaughn Schultze, and his co-defendants,[1] Valin Thomas Klock and Scott Alan Zunker, were indicted for the first-degree felony offense of aggravated sexual assault.[2] After appellant refused to enter a plea, the trial court entered a plea of not guilty on his behalf.[3] A jury found appellant and his co-defendants guilty and assessed punishment of 30 years in prison for appellant, 22 years for Klock, and 15 years for Zunker.

In seven points of error, appellant contends that his trial counsel was ineffective and that the trial court erred in (1) denying his request for a severance; (2) admitting a videotape of the death of appellant's roommate, John Hickman, at the punishment stage of trial; (3) excluding testimony about prison conditions; (4) allowing the State to argue about the crime's effect on the victim's parents; (5) refusing to instruct the jury, at the punishment stage, about the elements of the extraneous offenses; and (6) refusing to suppress a videotape of the sexual assault at the guilt stage of trial. We affirm.

## Background

On November 19, 2000, College Station Police Department Detective Chad Harkrider was called to investigate the alcohol-related death of John Hickman at 3311 Bahia in College Station. When he arrived at the scene and discovered there were numerous people to interview, he contacted College Station Police Sergeant Chuck Fleeger for assistance. Appellant and Klock were two of the people interviewed in connection with Hickman's death. During the course of the investigation, Detective Harkrider received an anonymous tip that there was a videotape of Hickman made on the night he died.

On March 27, 2001, Jana French, a friend of Klock's, provided the College Station Police Department with a videotape she had obtained from Klock. Fleeger

---

1. Appellant's co-defendants also appealed their convictions. The Opinions for *Klock v. State*, 01–02–00265–CR, 2005 WL 90928, 177 S.W.3d 53, and *Zunker v. State*, 01–02–00529–CR, 2005 WL 90932, 177 S.W.3d 72, were issued simultaneously with appellant's Opinion.

2. *See* TEX. PEN.CODE ANN. § 22.021(a)(2)(A)(v) (Vernon Supp.2004–2005) (acts in concert with another toward same victim).

3. A trial court must enter a plea of not guilty on behalf of the defendant when he refuses to plead. TEX.CODE CRIM. PROC. ANN. art. 27.16(a) (Vernon 1989).

watched the videotape and discovered that, in addition to depicting Hickman the night that he died, 18 minutes and 45 seconds of the tape showed three men sexually assaulting an unconscious female. Fleeger recognized appellant and Klock as two of the three assailants because he had recently interviewed them in connection with Hickman's death. He later determined the identities of the complainant[4] and the third assailant, Zunker.

The sexual assault[5] began with Zunker and appellant entering a room where Klock was having sexual intercourse with the complainant, who appeared to be unconscious and physically unable to resist. Appellant, while manning the video camera said, "in her fucking cunt," and Zunker attempted to insert a baseball in the complainant's vagina. Zunker manned the video camera while appellant inserted the handle of a toilet plunger into the complainant's vagina. Appellant told Zunker, "Make sure you get this on tape." When the plunger handle was inserted into the complainant's vagina, she moaned and said, "Ow. Stop," and continued to struggle. The three men laughed throughout the entire sexual assault. At one point, Zunker lit a cigarette and burned the complainant's vagina with the lit cigarette. Zunker then, mockingly, said, "Ow. That's got to hurt," and he proceeded to flick ashes onto the complainant's buttocks. Zunker and Klock also inserted a screwdriver and other objects into the complainant's vagina. The men continued to laugh as they performed these various acts on the unconscious complainant, with appel-

lant declaring, "this is fucking hilarious" at one point during the assaults.

Police officers arrested appellant, Klock, and Zunker the day after Sergeant Fleeger received the videotape. Also on that day, police officers searched the house at 3311 Bahia and found a video camera and a camera bag that contained another videotape. This second videotape showed appellant urinating on an unconscious Hickman.

During his investigation, Fleeger determined that the sexual assault occurred in July 2000, seven or eight months before the videotape was discovered.

## Motion to Suppress Evidence

In point of error seven, appellant contends that the trial court erred by denying his motion to suppress the sexual assault videotape "on the ground that Article 38.23 does not make stolen property inadmissible if a thief gives the property to the police." *See* TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon Supp.2004–2005).

### Standard of Review

A trial court's ruling on a motion to suppress evidence will not be set aside unless there is an abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim.App.1996); *Taylor v. State*, 945 S.W.2d 295, 297 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). We will afford almost total deference to a trial court's determination of facts supported by the record, especially when the findings are

---

**4.** Before the police showed her the videotape, the complainant did not know that she had been assaulted. She testified that she worked with Klock at a pub, and she and some of her girlfriends were at a bowling alley when Klock and his friends arrived. Both groups went to another pub and then on to a bar that appellant managed. There was excessive drinking, and the complainant did not re-

member any of the events occurring between the bar and waking up next to Klock in the Bahia house the next morning.

**5.** The description of the sexual assault is based on our review of the videotape as well as Sergeant Jeff Capps's testimony from the guilt stage of trial.

based on the evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *Spight v. State*, 76 S.W.3d 761, 765 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The appellate courts may review de novo "mixed questions of law and fact" not falling within this category. *Guzman*, 955 S.W.2d at 89.

**Standing**

■ Appellant filed a pretrial motion to suppress the videotape because "the videotape was taken from a home in which [appellant] had a privacy interest in violation of Article 38.23 V.A.C.C.P." Article 38.23 provides as follows:

> No evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX.CODE CRIM. PROC. ANN. art. 38.23(a). Appellant contends that Klock broke into the Bahia house and stole the videotape from appellant.

■ In its order denying the motion to suppress the videotape, the trial court found that "there [was] sufficient evidence to show that [Klock] had permission to be on the Bahia premises until well after Spring Break." The trial court also found that, "there is no evidence in the record that Defendant Klock, even if he took the video without Defendant Schultze's consent, intended to deprive Schultze of ownership." The trial court did not state

whether appellant had standing to complain of Klock's taking the videotape. However, failure to prove standing may be raised at any time, including for the first time on appeal. *State v. Klima*, 934 S.W.2d 109, 110–11 (Tex.Crim.App.1996); *Pennywell v. State*, 84 S.W.3d 841, 843–44 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

■ Standing is a question of law, which we review de novo. *State v. Johnson*, 896 S.W.2d 277, 285 (Tex.App.-Houston [1st Dist.] 1995), *aff'd*, 939 S.W.2d 586 (Tex.Crim.App.1996). To have standing, or a reasonable expectation of privacy, a defendant must show: (1) that he had an actual, subjective expectation of privacy, exhibited by measures taken to protect the privacy of the property in question, and (2) that his subjective expectation of privacy is one that society is prepared to recognize as reasonable. *See Jackson v. State*, 745 S.W.2d 4, 7 (Tex.Crim.App.1988).

During the suppression hearing, appellant called Travis Blount to testify. Blount testified that he was appellant's cousin and lived with appellant at 3311 Bahia Street at the time of the assault. Blount testified that the video camera used to film the assault belonged to Taylor Jordan—it was not appellant's camera. Travis testified that when Jordan left the camera at the house, he left it in the case, and it was possible that there were some tapes left in the case. Travis never saw what brand of videotapes appellant bought; therefore, he could not comment on whether the videotape used to tape the assault was one of the tapes appellant bought or one that may have already been in Jordan's video case.

Sergeant Fleeger testified during the suppression hearing that, after the police saw the videotape, they obtained a search warrant for the house on Bahia. When

they executed the warrant, they found the video camera and case in the living room. They found an .8 mm videotape in the case. Through his investigation, Fleeger concluded that the video camera and bag did not belong to appellant. Appellant did not testify at the suppression hearing.

The evidence elicited during the suppression hearing did not reveal who owned the videotape that contained the recording of the assault, where the videotape was usually kept, or from where the videotape was removed. There is no evidence in the record indicating what steps appellant took to protect the videotape. Nor is there any evidence that access to the videotapes was limited in any way. In fact, Blount testified that the occupants of the Bahia house frequently watched tapes they made with their friends. He testified that, after Klock moved out, Blount came home to find Klock, alone in the house, watching a videotape of Hickman's death.

Appellant failed to present sufficient evidence during his suppression hearing to establish that he took any measures to protect the privacy of the property in question and, therefore, did not show he had a reasonable expectation of privacy in the videotape recovered from their home. *See Jackson,* 745 S.W.2d at 7. The evidence in the record does not establish that appellant had standing to have the videotape suppressed. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion to suppress the videotape.

We overrule point of error seven.

### Ineffective Assistance of Counsel

In point of error one, appellant contends that his trial counsel was ineffective. The standard of review for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80

L.Ed.2d 674 (1984); *see Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). Appellant must show both that (1) counsel's performance was so deficient that he was not functioning as acceptable counsel under the Sixth Amendment, and (2) there is a reasonable probability that, but for counsel's error or omission, the result of the proceedings would have been different, i.e., sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 687–96, 104 S.Ct. at 2064–69. Effective assistance of counsel does not mean errorless counsel. *See Saylor v. State,* 660 S.W.2d 822, 824 (Tex.Crim.App.1983). In determining whether counsel was ineffective, we consider the totality of the circumstances of the particular case. *Thompson,* 9 S.W.3d at 813.

It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson,* 9 S.W.3d at 813. A defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.). An appellate court will not find ineffectiveness based on speculation. *Henderson v. State,* 29 S.W.3d 616, 624 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd); *Gamble,* 916 S.W.2d at 93. Assertions of ineffective assistance of counsel must be firmly founded in the record. *Bone v. State,* 77 S.W.3d 828, 835 (Tex.Crim.App.2002).

### Sole Defense

Appellant argues that his trial counsel failed to present his sole defense—that the videotape was illegally obtained and, thus, subject to suppression. *See* Tex.Code Crim. Proc. Ann. art. 38.23(a). Appellant contends that his trial counsel failed to ask the trial court to instruct the jurors, under article 38.23(a), that they must disregard the videotape if they believed Klock ob-

tained it illegally. He argues that this was his "sole defense before the jury, but counsel never presented it, thus guaranteeing a conviction, as shown by his three-page argument that gave jurors no reason whatever to vote not guilty."

However, as noted above, appellant lacked standing to suppress the videotape. Because appellant was precluded from obtaining a 38.23(a) instruction to the jury regarding the videotape, his counsel's failure to ask for one was not deficient.

## Multiple Serious Errors

Appellant also argues that his trial counsel committed multiple serious errors that should diminish this Court's confidence in the outcome of the punishment hearing. Appellant cites six examples of alleged ineffectiveness of his counsel: (1) in opening argument during punishment, the prosecutor, without objection, accused appellant of having committed a "first-degree felony offense" of evading arrest, which is really a Class A misdemeanor; (2) trial counsel failed to elicit testimony regarding appellant's reasons for not calling for help earlier on the night that Hickman died; (3) trial counsel failed to object to the prosecutor's argument as being outside the record; (4) trial counsel failed to object to criticisms of appellant for exercising his constitutional rights; (5) trial counsel failed to object to a co-defendant's argument seeking a severe sentence for appellant; and (6) trial counsel failed to object to the prosecutor's arguments that were outside the record.

### First Degree Felony Offense

Appellant argues that his trial counsel was ineffective for failing to object to the State's classification of evading arrest as a first degree felony offense. The statement in question was as follows:

> We're going to show you an incident that occurred with respect to Mr. Schultze, just a few months ago while he

was on bond *in this case*, a first degree felony offense in which he led police on a hundred-mile-an-hour-plus chase, refusing to stop.

(Emphasis added.) The aggravated sexual assault of the complainant was a first degree felony offense, and the record above indicates that the prosecutor was referring to this offense, not "evading arrest," as a first degree felony. Appellant's trial counsel was not ineffective in not objecting to this statement.

### Reason for Delayed Call for Help

The trial court excluded, as hearsay, testimony from Amanda Toepperwein, appellant's friend, that appellant did not call for help earlier in the night of Hickman's death because Hickman was on bail for intoxication assault at the time of his death, and his intoxicated state was a clear violation of the conditions of his bond. Appellant argues that his trial counsel was ineffective in failing to introduce the testimony from other sources. Appellant argues that this testimony was vital to show his "concern, not disregard, for Hickman's welfare."

Toepperwein was allowed to testify that, the night Hickman died, appellant was "scared," "worried," and "concerned" about Hickman. Hickman was "drunk" and "passed out all the time," so everyone thought this was "a normal night." She also testified that she called 9–1–1, but couldn't "get anything out" so she gave the phone to appellant who "took control of the situation from that moment on." The Toepperwein testimony that was allowed established that the occupants of the Bahia house "pranked" on each other frequently, and that appellant was concerned about Hickman, who was his friend. Furthermore, Detective Harkrider testified that appellant did not return from work until 3:30 a.m. on the morning of Hickman's

death, and Hickman was alone and already passed out on the couch. This was only approximately 30 minutes before Toepperwein arrived and called 9–1–1.

Accordingly, we cannot conclude, based on the record, that appellant's trial counsel's performance, in not introducing evidence that Hickman was on bond, was so deficient that he was not functioning as acceptable counsel.

*Argument Outside the Record*

Appellant contends that, during the punishment stage *argument*, Zunker's counsel accused appellant of stealing from his employer by letting Zunker, a fellow employee, eat and drink for free. Appellant suggests that this characterization was particularly harmful because it rebutted testimony from several witnesses that appellant was a dedicated, loyal, hardworking employee.

However, the statement was actually made during Zunker's *opening statement;* prior to the presentation of punishment evidence; therefore, an objection as being "outside the record" would have been inappropriate, and counsel's failure to object to the remark was not deficient.

*Exercising Constitutional Right*

■ Appellant also contends that his trial counsel was ineffective for failing to object to an improper argument made by Zunker's attorney. Zunker's attorney compared Zunker, who had been in jail for 11 months before trial without posting bail, to appellant who, he declared, was "out running around" during this time. Appellant argues that it was improper for Zunker's counsel to disparage appellant for exercising "his Eighth Amendment constitutional right to be punished after being convicted, instead of before, like Zunker."

During his opening statement prior to the presentation of punishment evidence,

Zunker's attorney described Zunker as aimless and on the "wrong track" long before he met appellant. Zunker's attorney argued that, when Zunker was arrested and charged with a first degree felony, "there began to be the change in Scott Zunker." He had been in jail ever since because he could not post bail. "He hasn't been running around like the others." "So he's got to sit there.... He can't drink.... At first anger, depression—severe depression. Embarrassment." Zunker's trial counsel further explained that, once Zunker "dried out," he began to pursue his faith and "he even considers 11 months in jail now a blessing."

The focus of Zunker's attorney's remarks was on Zunker's "change," not on appellant. From this record, we cannot conclude that appellant's trial counsel's performance, in not objecting to the above statement made by Zunker's attorney, was so deficient that he was not functioning as acceptable counsel.

*Zunker's Attack*

Appellant contends that Zunker's attorney, during his punishment argument, made a "nine-page attack" on appellant, ending with a suggestion of "a severe sentence for one person [appellant] and probation for another." He argues that his trial counsel was ineffective in failing to object that it was improper for Zunker's lawyer "to be arguing for a severe sentence for appellant."

At the conclusion of Zunker's closing argument at the punishment stage, he stated:

I asked you in the jury selection phase if you could separate these people out and you-all promised me you could. You promised me then. I ask you to hold to that now.

Is it conceivable to you that you could give a severe sentence to one person and

probation to another? Anybody have a problem doing that in a proper case? None of you raised your hand.

Thus, the record reveals that Zunker's counsel did not, in fact, argue for a "severe sentence for appellant," and his counsel's failure to object to the above statement was not deficient.

*Outside the Record*

■ Finally, appellant contends that his trial counsel was ineffective for failing to object when the prosecutor argued outside the record. In his closing argument, the prosecutor stated, "For Eric Schultze, you can watch that video of the night that John Hickman died and *ask yourself: Does he deserve even more?* John Hickman could have been saved that night."

■ Permissible jury argument falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law enforcement; and (4) response to opposing counsel. *Felder v. State,* 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992).

Assuming, without deciding, that the prosecutor's closing remarks were not a reasonable deduction from the evidence, as the State contends they were, there are several reasons why the jury could have given appellant a more severe punishment than the other defendants, not the least of which are that he had more extraneous offenses than they did, his police statement indicates he refused to show any remorse for the sexual assault incident,[6] and he was the only one of the defendants present in the two Hickman videotapes. Accordingly,

appellant has failed to demonstrate that there is a reasonable probability that, but for his counsel's failure to object to the above statement, the results of the punishment proceeding would have been different.

**Single Egregious Error**

Appellant argues that a single egregious error by trial counsel can constitute ineffective assistance, and that no hearing on ineffectiveness or evidence of trial strategy is required. *See Thompson,* 9 S.W.3d at 813. Here, however, appellant has not presented any error egregious enough to constitute ineffective assistance of counsel. Accordingly, we hold that appellant has not met his burden to prove ineffective assistance of counsel by a preponderance of the evidence.

We overrule point of error one.

**Severance**

■ In point of error two, appellant argues that the trial court erred in denying appellant's motion for severance, especially at the punishment stage.

■ Severance is not a matter of right, but rests within the sound discretion of the trial court. *Peterson v. State,* 961 S.W.2d 308, 310 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). To show an abuse of discretion, an appellant bears the heavy burden of showing clear prejudice. *Id.*

A trial court must order a severance upon a timely motion and upon introduction of evidence that establishes either (1) that there is a previous admissible convic-

---

6. In the statement appellant gave to Detective Capps when he was arrested for the sexual assault, appellant denied any involvement and then stated that the video camera did not work. He also denied knowing anything about a tape of Hickman the night he died. After Detective Capps showed him the video, appellant responded, "I remember this now, oh shit." He said that the complainant was awake when they were assaulting her, and she was talking to Klock while they "were doing that shit." Later in the statement, he told Detective Capps, "Hope I don't have to go to court for all this cause I'm moving to freakin' Mexico."

tion against one defendant or (2) that a joint trial would be prejudicial to any defendant. TEX.CODE CRIM. PROC. ANN. art. 36.09 (Vernon 1981); *Aguilar v. State,* 26 S.W.3d 901, 903 (Tex.Crim.App.2000). Specifically, article 36.09 provides that:

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX.CODE CRIM. PROC. ANN. art. 36.09.

▌ Generally, when two defendants are jointly indicted for the same offense, they should be tried jointly. *Dickerson v. State,* 87 S.W.3d 632, 639 (Tex.App.-San Antonio 2002, no pet.). However, the trial court may order separate trials, at its discretion. *Id.* If a joint trial would prejudice either defendant, upon proper motion to sever, the trial court must sever the trial of the defendant whose joint trial could prejudice the other. *Id.*

▌ The mere allegation that prejudice will result is not evidence of, or a sufficient showing of prejudice, as required under article 36.09, particularly when the

severance is discretionary with the trial court. *Mulder v. State,* 707 S.W.2d 908, 915 (Tex.Crim.App.1986). If no evidence is offered in support of the motion to sever, the trial court does not err in overruling the motion. *See Sanne v. State,* 609 S.W.2d 762, 776 (Tex.Crim.App.1980).

On appeal, appellant clearly states that he did not argue for severance based on *the State's* evidence and argument, but because of *Zunker's and Klock's* evidence and argument. Appellant argues that the trial strategy employed by Zunker and Klock was to establish that appellant was the one with the camera. He was the "director" of these videos, and Zunker and Klock were merely following appellant's direction. Consequently, appellant was defending himself against three prosecutors-Zunker's attorney, Klock's attorney, and the district attorney.

All three defendants sought severance during punishment. Zunker and Klock moved for severance when the State introduced the videotape of Hickman's death. The attorneys argued that the videotape was so prejudicial that an instruction to disregard as to their two clients would not sufficiently overcome the prejudicial effect. Zunker's attorney re-urged his request for a severance at the conclusion of lengthy testimony about an assault appellant committed. He complained that the testimony regarding the fight would never have been introduced had the cases been severed and that Zunker was harmed by the testimony.

In his brief to this Court, appellant states that he renewed his motion for severance twice during the punishment stage. Appellant refers us to two places in the appellate record to support this statement.[7] The first reference was made after Zunker testified, and Klock's and appel-

---

7. Appellant cites seven additional references to the appellate record. None of these references actually pertains to severance. They

address the trial court's ruling that one objection was good for all the defendants.

lant's attorneys moved for severance because they believed Zunker's testifying, in a sense, commented on Klock's and appellant's ability to testify, but decision not to testify.

The second reference again stated

we would reurge the Motion for Severance based upon the testimony, the fact that Scott Zunker testified in the case and I anticipate that there will be—I anticipate that there will be closing arguments made by Zunker's attorney specifically on the issue of Defendant Zunker's waiving his Fifth Amendment right and taking the witness stand and being confronted, willing to confront himself by cross-examination based upon: A, the fact that Zunker did testify; and 2, anticipating closing arguments.

This is a different basis for severance than appellant is raising on appeal-that he was forced to defend against three prosecutors.

■■■ The Texas Rules of Appellate Procedure require that, in order for an issue to be preserved for appeal, there must be a timely objection, which specifically states the legal basis for the objection. TEX. R.APP. P. 33.1(a). It follows, that an objection stating one legal basis may not be used to support a different legal theory on appeal. *See Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Crim.App.1977). Courts have routinely held that where a complaint on appeal does not comport with an objection made at trial, the error is not preserved on the complaint. *Goff v. State*, 931 S.W.2d 537, 551 (Tex.Crim.App.1996); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim.App.1995); *Dunn v. State*, 819 S.W.2d 510, 524–25 (Tex.Crim.App.1991) (discussing the importance of specific objections required under Rule 52, predecessor to Rule 33.1).

■■■ Here, appellant presents a different basis for severance on appeal than was raised in the trial court. An objection raised on appeal will not be considered if it varies from the objection made at trial. *Coffey v. State*, 796 S.W.2d 175, 179 (Tex. Crim.App.1990).

Because his complaint on appeal does not comport with his objections made at trial, appellant has failed to preserve the issue for review. TEX.R.APP. P. 33.1.

We overrule point of error two.

### Erroneously Admitted/Excluded Evidence

In points of error three and four, appellant argues that the trial court erred in (1) admitting a videotape and other evidence of Hickman's death and evidence of appellant urinating on Hickman and (2) excluding Leroy Hall's testimony about prison conditions.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996). Where the trial court's evidentiary ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the reviewing court must uphold the trial court's ruling. *Id.* All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by the rules of evidence, or by other rules prescribed pursuant to statutory authority. TEX.R. EVID. 402. Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. TEX.R. EVID. 401. After the defendant has been found guilty, evidence may be offered by the State and the defendant "as to any matter the court deems relevant to sentencing." TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp.2004).

The erroneous admission or exclusion of evidence does not result in reversible error unless it affects a substantial right of the accused. *See* Tex.R.App. P. 44.2(b); *Alexander v. State*, 137 S.W.3d 127, 130 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd). Substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

**John Hickman's Death**

In point of error three, appellant contends that the trial court erred in admitting a videotape and other evidence of John Hickman's death and evidence that appellant urinated on Hickman on another occasion.

Appellant videotaped Hickman shortly before Hickman died of an overdose of alcohol. The videotape shows that, while Hickman lay, unconscious, on a couch in the living room of the Bahia house, appellant and several other men, laughed at him, poured water on his head, and shaved his pubic hair with an electric razor. This recording was made on the same videotape on which the sexual assault had been recorded. Another videotape that was recovered, pursuant to a search warrant, showed appellant urinating on Hickman, while Hickman lay unconscious in bed. The two Hickman recordings were not filmed on the same night.

*Guilt Stage—Background Contextual Evidence*

 Appellant argues that any reference to Hickman's death was inadmissible at the guilt stage because it was "background contextual evidence" rather than "same transaction" contextual evidence.

The Court of Criminal Appeals has distinguished two types of background evidence admissible under rule 404(b): (1) evidence of other offenses connected with the primary offense, referred to as "same transaction contextual evidence" and (2) general background evidence, referred to as "background contextual evidence." *Mayes v. State*, 816 S.W.2d 79, 86–87 (Tex. Crim.App.1991). Background contextual evidence is "proof of facts that do not bear directly on the purely legal issues, but merely fill in the background of the narrative and give it interest, color, and lifelikeness." *Id.* at 87. In other words, the evidence must be necessary to the jury's understanding of the instant offense because the circumstances of the offense would make little or no sense without the admission of the background contextual evidence. *See id.* In *Mayes,* the Court of Criminal Appeals held that it was error to admit background evidence when the testimony at issue constituted evidence of appellant's character. *Id.* at 88.

Appellant contends that, because Hickman died more than four months after the sexual assault, evidence of Hickman's death constituted "background contextual" evidence and not "same transaction" evidence and was, therefore, inadmissible. Evidence of Hickman's death was not necessary to show how the police acquired the tape or how they identified appellant on it.

Assuming, without deciding, that the admission of the evidence was improper, appellant has not shown that he was harmed by the admission of such evidence at the guilt stage or that the jury was improperly swayed by the admission in its determination of appellant's guilt. *See King,* 953 S.W.2d at 271. As appellant concedes in his brief to this Court, "the evidence of appellant's guilt, [the sexual assault video], was overwhelming."

*Punishment Stage—Unduly Prejudicial*

Appellant also argues that the videotape of Hickman's dying moments and the urination scene should have been excluded

under Texas Rule of Evidence 403 at the punishment stage.

 A trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of trial. *Henderson*, 29 S.W.3d at 626. Trial courts may admit evidence deemed relevant to sentencing, including evidence of other crimes or bad acts. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp.2004–2005).[8] At the punishment hearing, relevant evidence is that which assists the fact finder in determining the appropriate sentence given the particular defendant in the circumstances presented. *Rogers v. State*, 991 S.W.2d 263, 265 (Tex.Crim.App.1999). This language grants wide latitude in the admission of evidence deemed relevant, including evidence arising after the offense. *Contreras v. State*, 59 S.W.3d 362, 365 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX.R. EVID. 403. As used in rule 403, "unfair prejudice" means the undue tendency of the evidence to suggest a decision on an improper basis. *See Rogers*, 991 S.W.2d at 266. We will not disturb a trial court's determination regarding the admissibility of relevant evidence unless an abuse of discretion has been shown. *See Green*, 934 S.W.2d at 101–02.

Appellant does not assert that the Hickman videotapes were irrelevant. He contends, however, that the probative value of the tapes was outweighed by their prejudicial effect.

*Waiver*

 Texas Rule of Evidence 403 must be specifically invoked in order to preserve error under that rule. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim.App.1991); TEX.R.APP. P. 33.1. Appellant refers us to four places in the record where he contends he made a specific 403 objection.

The first reference involves argument relating to Zunker's motion in limine. Zunker attempted to prevent the officers from testifying that they recognized Zunker's voice on the sexual assault tape from previous encounters they had with Zunker. After the trial court overruled the motion in limine "to the extent of its broadness," Zunker's attorney responded, ". . . It's an extraneous offense, and it—the prejudicial nature of it outweighs the probative value." As the trial court confirmed, this objection was based on a concern that the officers would testify, "Yeah, we know the guy from before because of other investigations we've done." This objection did not pertain to the same concerns appellant is now raising on appeal. Therefore, Zunker's objection did not preserve this point of error.

Next, appellant refers us to a portion of the record where he complained that the

---

**8.** Sec. 3. Evidence of prior criminal record in all criminal cases after a finding of guilty. (a)(1) Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the of-

fense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.
TEX.CODE CRIM PROC. ANN. art. 37.07 § 3(a)(1).

Hickman video contains hearsay. Counsel further urged

the Court to engage in a 403 balancing test because of the inflammatory nature of the comments that are made.

Specifically, there are, I believe, some racial overtones to the comments that are made by third parties in the room. I think there is also some other inflammatory statements particularly of the nature saying, "die, die" or something "I hope you die." I think that's what I heard.

I would argue that the (sic) any probative relevant evidence that could be gathered by that portion of the video is substantially outweighed by the confusion of issues, the prejudicial effect; and I would ask the Court to—if it overrules my objections on hearsay and authentication basis that engage and rule on my 403 objection.

This 403 objection specifically complains of comments on the videotape made by unidentified third parties. On appeal, appellant does not mention the comments of third parties. His point of error only addresses the prejudicial effect of the reference to, and videotape of, Hickman's death—concerns not addressed by this objection in the trial court. This objection does not preserve this point of error for review.

Before the videotape depicting Hickman's death was offered at trial, appellant stated that "in addition to the objections lodged yesterday [listed in the preceding paragraph] particularly with regard to hearsay and Rule 403, which the Court has previously ruled upon, I'm also objecting under Rule 901 that the videotape has not been properly authenticated as to all voices on the videotape have not been identified." Finally, before the State offered the Hickman urination video, appellant stated, "in addition to the objections lodged yesterday [set forth in the preceding paragraph] outside the presence, I would also urge the failure of the State to give adequate notice of 37.07." These two passages simply remind the trial court that appellant previously objected to the prejudicial effect of the third-party comments. They do not raise additional 403 objections.

Where a complaint on appeal does not comport with an objection made at trial, the error is not preserved on the complaint. *Goff*, 931 S.W.2d at 551. Because he did not object to the admission of the videotapes on the grounds urged on appeal, appellant has failed to preserve the issue for review. Tex.R.App. P. 33.1; *see Montgomery*, 810 S.W.2d at 389.

We overrule point of error three.

### Leroy Hall's Testimony

 In point of error four, appellant argues that the trial court erred during the punishment stage of trial in excluding Leroy Hall's testimony about prison conditions, which was essential to rebut the State's lengthy evidence about prison conditions.

During the punishment stage, Zunker's attorney called Reginald Jenkins as a witness. Jenkins is a detention officer with the Brazos County Sheriff's Department, and he was previously employed as a prison guard at a maximum security prison. Jenkins testified that Zunker had been a "model inmate" during his more than 300 days of detention at the time of trial. Jenkins explained what a normal day is like for Zunker while in detention, and that, due to his conviction for aggravated sexual assault, he cannot be a prison trustee.

Klock's attorney questioned Jenkins about the conditions in maximum security prisons. Jenkins testified that it was "very possible" that the defendants would be going to a maximum security prison,

which holds murderers, major drug dealers, embezzlers, and forgers. He further testified that there is "rampant gang affiliation" in prison.

On cross-examination, the State elicited more testimony regarding the conditions in prison. Jenkins testified that rigid laws regulate prisons to make sure they are safe. Prison units have job fairs and classes allowing the inmates to get degrees ranging from G.E.D.s to Ph.D.s, and law libraries that are "second to none." Prison units also have exercise weights, baseball diamonds, basketball courts, and horseshoes. Each prison unit has a minimum of two televisions in each dayroom, and inmates are allowed to see the National Basketball Association finals and the Super Bowl on television.

On re-direct examination, appellant's attorney asked Jenkins if he felt it would be helpful to hear from someone who "was actually on the inside looking out." Jenkins responded, "possibly."

Later, Zunker's attorney called Leroy Hall to testify about the time that he served in the Texas Department of Corrections from 1990–1997. The State objected that the testimony from Hall concerning prison conditions was irrelevant. Zunker's attorney responded that the State had "opened the door to the country club atmosphere," and the trial court originally agreed. When the State added that the witness was an expert who had not been properly designated, the trial court overruled that objection as well.

After Zunker's attorney asked Hall a few more questions, the trial court began sustaining the State's "relevance" and "invading-the-province-of-the-jury" objections. The trial court then discussed its rulings outside the presence of the jury and reconsidered and sustained the State's relevance objection. The defendants' attorneys made a bill of exception, and, at the conclusion of the bill, the trial court clarified that Hall's testimony was inadmissible, and the court instructed the jury to disregard it. The trial court stated that it based its decision on

> 401, the relevance. I'm also basing my decision on the fact that I did not believe the door was opened by the State. Number three, I'm making my decision on the fact that ... I still think 701 and 702 may apply and there should have been a notice given that this person was an expert witness.

 The Court of Criminal Appeals has explained that, under Texas Code of Criminal Procedure Annotated article 37.07 section 3(a), the admissibility of evidence at the punishment phase of a non-capital felony trial is a function of policy rather than relevancy. *See Mendiola v. State*, 21 S.W.3d 282, 285 (Tex.Crim.App. 2000); *Miller–El v. State*, 782 S.W.2d 892, 895 (Tex.Crim.App.1990). This is so because, by and large, there are no discrete factual issues at the punishment stage. *Miller–El*, 782 S.W.2d at 895–96. Thus, determining what is "relevant" in regard to punishment, under article 37.07 section 3(a), "should be a question of what is helpful to the jury in determining the appropriate sentence in a particular case." *Mendiola*, 21 S.W.3d at 285. In *Schielack v. State*, 992 S.W.2d 639 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd), when faced with the attempt to introduce similar evidence to that which was attempted to be introduced here, the Fourteenth Court of Appeals held as follows:

> In the present case, the testimony which [Schielack] sought to introduce was neither [evidence of the circumstances of the offense itself or the defendant himself]. In fact, the testimony consisted of another person's experiences in prison. There is no evidence that [Schielack's] experience would be the same. As such,

we believe that the trial court's decision to exclude this testimony was at least within the zone of reasonable disagreement; therefore, the trial court did not abuse its discretion.

*Id.* at 642–43.

Appellant argues that *Schielack* is not instructive because Hall's "testimony was not offered to show what Appellant's experiences would be." However, during the defendants' bill of exception, Hall testified, at length, about the consequences of being "fresh meat" in prison. After the recitation, Zunker's attorney and appellant's attorney asked Hall to comment as to whether each of the defendants would be treated as "fresh meat." Zunker's counsel asked Zunker to stand and then asked Hall, "What about a white male that's never been to prison before that's his size and weight. Is he going to be considered fresh meat or not?" Appellant's attorney then asked appellant to stand, and he asked Hall, "Are the things that you said pertaining to Mr. Zunker ..., would that go for Mr. Schultze as well?" "Yes. It will go for anybody that goes into the system that's never been there before." Contrary to appellant's assertion on appeal, Hall's testimony was elicited specifically to educate the jury on what appellant's prison experiences would be.

The trial court could have reasonably concluded that Hall's testimony would not have been helpful to the jury in determining the appropriate sentence in this case. Also, the trial court could have reasonably concluded that Hall's testimony went beyond the scope of any door opened by the State. Under the precedent of *Mendiola,* the trial court's decision to exclude the testimony of Hall was at least within the zone of reasonable disagreement.

Accordingly, we hold that the trial court did not err in excluding Hall's testimony. Having held that the trial court did not err

in excluding Hall's testimony, we need not determine whether Hall was a properly designated expert.

We overrule point of error four.

### Jury Argument

 In point of error five, appellant contends that the trial court erred in allowing the State to argue about the sexual assault's effect on the complainant's parents who did not testify.

 The law provides for, and presumes, a fair trial, free from improper argument by the State. *Long v. State,* 823 S.W.2d 259, 267 (Tex.Crim.App.1991). Proper jury argument generally must encompass one of the following general areas: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (3) an answer to the opposing counsels argument; or (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App. 1999); *Sandoval v. State,* 52 S.W.3d 851, 857 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). To determine whether a party's argument properly falls within one of these categories, we must consider the argument in light of the entire record. *Sandoval,* 52 S.W.3d at 857. In most cases, if error occurs, an instruction to disregard will cure any error committed. *Shannon v. State,* 942 S.W.2d 591, 597 (Tex.Crim. App.1996).

During closing argument at the punishment stage, the State argued:

Imagine the embarrassment, the humiliation that [the complainant] has had to go through. Every time you think about the excuses the Defendants offered, think about [her], what she's going through, what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.

The trial court overruled appellant's objection that the prosecutor's argument was outside the record. Appellant argues that this statement was a direct violation of the trial court's ruling on a motion in limine "that the State's attorney not mention or state to the jury the probable testimony of any witness who is absent or unavailable and was not called to testify in this cause."

■ The complainant's parents did not testify; therefore, the argument was outside the record, and the trial court erred in overruling appellant's objection. Appellant concedes that "the error was nonconstitutional; thus, the standard of review is that in Tex.R.App. P. 44.2(b)." Rule 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded." Tex.R.App. P. 44.2(b). Determining harm under that standard in improper argument cases requires balancing the following three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction/punishment absent the misconduct. *Id.; Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998).

**Severity of the Misconduct**

In *Martinez v. State,* 17 S.W.3d 677 (Tex.Crim.App.2000), the Court of Criminal Appeals was faced with a similar issue when it was asked to reverse a death penalty conviction in light of the following jury argument at the conclusion of the punishment stage of trial:

> PROSECUTOR: And based on this evidence, this—this rates as one of the worst crimes, one of the worst killings not only in Brazoria County but the State of Texas.
>
> DEFENSE COUNSEL: Objection, your honor. That's not in the record.
>
> THE COURT: Stay in the record, counsel.

> PROSECUTOR: The evidence shows you, these were execution killings. 26 to 28 bullets. The family of the murdered victims, the family—the victims themselves, they cry out to you, for the death penalty in this case. There's no more—
>
> DEFENSE COUNSEL: Objection, your Honor. Not in the record, either. Absolutely no evidence of that.
>
> THE COURT: Overruled.
>
> PROSECUTOR: Justice in this case requires you, because we told you from day-one, what we wanted was a fair jury, a jury that would do justice in this case.

*Martinez,* 17 S.W.3d at 692. The court concluded that

> the degree of misconduct, if any, was relatively mild in the present case. The prosecutor's comment that the victims and their families cry out for the death penalty appears to be intended as a plea for law enforcement. The jury was in a position to know that victims who are dead cannot presently cry out for the death penalty, and that, given the facts surrounding their deaths, no such cries were made before they died. *Nor would the jurors be surprised to hear that the victims' families would be upset with appellant or that they would want retribution.* And the prosecutor did not attempt, through this argument, to convey any specific facts about the effect of the victims' deaths upon their families. Instead, the prosecutor was pleading with the jury to give the death penalty because the record before the jury showed that the defendant deserved it. To the extent that the prosecutor conveyed facts outside the record, such facts had no tendency to adversely influence the jury against appellant beyond the influence exerted by a wholly legitimate plea for law enforcement.

*Id.* at 693 (emphasis added). Here, like in *Martinez,* the prosecutor's comments did not attempt to convey *specific* facts about the effect of the complainant's assault upon her family so much as it was conveying matters the jury would not be surprised to hear because they are obvious or common knowledge. Accordingly, we conclude that the degree of misconduct was minimal.

**Curative Measures**

The trial court did not make any attempt to cure the misconduct.

**Certainty of Punishment Absent the Misconduct**

Appellant was found guilty of the first-degree felony offense of aggravated sexual assault—an offense punishable by imprisonment for life or for a term of not more than 99 years or less than 5 years. *See* TEX. PEN.CODE ANN. § 12.32 (Vernon 2003). If a jury sentences an individual to less than 10 years, it may recommend to the judge that the imposition of the sentence be suspended and that the defendant be placed on community supervision. TEX. CODE CRIM. PROC. ANN. art 42.12, § 4(a), (d)(1) (Vernon Supp.2004–2005). Here, almost every defense witness was asked if he thought appellant should get probation, but the jury assessed punishment at 30 years in prison. To evaluate the "certainty of the punishment absent the misconduct," we must examine all the evidence presented during punishment.

**State's Witnesses**

The jury saw the videotape of Hickman taken shortly before his death. Sergeant Fleeger testified that neither Zunker nor Klock was present in the Hickman video and that appellant's voice is heard narrating the videotape showing, among other things, an unconscious Hickman getting his genitals shaven. The jury was also shown the videotape appellant took, on another occasion, while he urinated on an unconscious Hickman. Sergeant Fleeger testified that appellant was not a peaceful, law-abiding citizen and that he has a bad reputation in the community.

Detective Harkrider testified that, while he was never implicated in Hickman's death,[9] appellant was not "truthful" during his discussions with the police. While Harkrider was investigating Hickman's death, appellant never mentioned that he had videotaped the events leading up to Hickman's death. Appellant never told Harkrider that water was poured on an unconscious Hickman's head, that Hickman's penis was played with while he lay on the couch, or that someone shaved Hickman's pubic hair while he lay on the couch. Detective Harkrider testified that appellant was not a peaceful, law-abiding citizen and had been cited for criminal mischief.

College Station Fire Department Lieutenant Mike Ruesink testified that he responded to a call at the Bahia house 5:40 a.m. the morning Hickman died, and, when he arrived, he found Hickman's heart had stopped beating, and he was not breathing. He died at the hospital that morning.

Karen Rogers, who lived next door to the Bahia house, testified that she was "afraid to go outside" when appellant was outside.[10] She reported that, at 7:50 a.m. on December 15, 2000, appellant yelled at her as she tried to get in her car to go to work. He yelled, "I hate my cock-sucking fucking cock-sucking neighbors and that they were all cock-suckers," and he threw

9. Appellant arrived at about 3:30 a.m. the morning of Hickman's death, and he did not see Hickman ingest the Vicodin that, combined with alcohol, caused Hickman's death.

10. Rogers testified that she was "uncomfortable" around Zunker and Klock "but not as afraid" as she was around appellant.

a beer bottle at her. Rogers called the police, and appellant told her that "he was going to be [her] worst nightmare" until she moved out. Tim Rogers, Karen's husband, went outside and confronted appellant and, during the confrontation, Tim accused the residents of the Bahia house of failing to take care of their friend who died. Zunker, who had walked up while appellant and the Rogerses were arguing, threatened to kill Tim.

Police Officer David Robinson responded to Karen Rogers's call to the police. He testified that he took appellant's and Zunker's statements, and he did not believe that either of them was intoxicated when the threat to kill Tim Rogers was made. Zunker received deferred adjudication for the incident.

The jury heard testimony from Mike Patterson, the assistant chief of the College Station police department, concerning the events surrounding the threat Zunker made to Tim Rogers. Patterson testified that he attempted to ask Zunker questions, but appellant would answer for him. He told the jury that appellant "lied to me from the minute we got there."

Sean Copeland, another Bahia house neighbor, testified that there were parties at the Bahia house all the time, and there were beer bottles in the yard and glass in the street. He testified that appellant drove through Copeland's yard and "peeled out," and appellant was cited for "reckless damage" for the damage caused to Copeland's yard.

College Station Police Officer Rick Vessel testified that, on July 6, 2000, he was called to the Kettle Restaurant because the manager reported that four men had stolen two paintings from the restaurant. Two days later, the manager called Vessel again and said that the men were back. Vessel approached appellant, who was one of the men that the manager had recognized, and appellant produced one of the paintings. Appellant was charged with a class C misdemeanor and a criminal trespass warrant was issued preventing appellant from returning to the restaurant.

Bryce Pflughaupt testified that, on December 9, 2000, appellant approached him at a bar and said, "It's my birthday. Tonight I'm going to kick somebody's ass." Appellant approached him a second time and said, "I'll kill you, mother fucker." Pflughaupt testified that the manager of the bar asked appellant, Klock, and a couple of other people who were with them, to leave. When Pflughaupt left the bar an hour and one half later, appellant and his friends were waiting for him. Appellant hit him and knocked him to the ground. Klock kicked him and prevented him from getting up. The jury was shown photographs of Pflughaupt taken at the emergency room after the fight. Pflughaupt described his injuries to the jury. He said that his "nose was pretty puffy.... [His] eyes swollen shut. [His] lip down on my teeth from that cut. Bruised. Pretty banged up pretty bad." He testified that his wrist was broken, and it required surgery and rehabilitation as a result of the fight initiated by appellant.

Jennifer Hovel, a one-time girlfriend of both appellant and Pflughaupt, testified that, on December 9, 2000, she heard appellant approach Pflughaupt at the bar and say, "Someone is going to get their ass beat tonight you pussy mother fucker." The jury heard a tape recording of a message appellant left on Hovel's telephone answering machine after the fight with Pflughaupt. On the message, appellant apologized for "what he did to Bryce." He said that he was "real fucked up."

Stephen Rogers testified that he was walking behind Pflughaupt on December 9, 2000, when a group of guys circled Pflu-

ghaupt and "basically just beat the crap out of him." The circle of guys would not let anyone in to break up the fight. He did not see who the people were who were fighting Pflughaupt.

Converse Police Officer Carlos M. Licea testified that, on August 6, 2001, he saw a truck run a red light at 4 a.m. He was driving over 100 miles per hour, and he could not catch up to the truck. Officer Licea testified that the truck turned off its headlights a couple times, and driving at that rate of speed, at that time of the morning on rural, dirt roads was not safe. Officer Licea ultimately caught appellant when he turned down a road that was a dead end. The jury was shown appellant's "mug shot" that was taken after he was arrested for evading arrest. Appellant told Licea that "he didn't feel like stopping. He saw my lights, but he wanted to see if he could get away from me." Licea also testified that, once they were in the well-lit police station, appellant "got at good look" at Licea and said that he "could take [Licea] on or he could have taken [Licea] on." Appellant pleaded no contest to the offense and received deferred adjudication and a fine. This arrest occurred while appellant was out on bond for aggravated sexual assault.

**Defense Witnesses**

Zachary Kent, who is "very good friends" with appellant, testified that he had worked at a bar that appellant managed. Kent testified that Pflughaupt was the aggressor in the fight with appellant. He confirmed that appellant and his friends were thrown out of the bar the night of the fight. Kent conceded that it was possible that appellant threw the first punch. Kent left the scene of the fight

because the manager said that "the cops were coming."

Amanda Biggers, whose sister currently dates appellant's brother, testified that she first met appellant in high school where appellant was a member of the honor society and made As and Bs in his classes. He played on the football and baseball teams and "walked on" to the Texas Tech University football team. Appellant and Biggers dated off and on for three years. She told appellant that she was concerned about his increased alcohol consumption, and they ultimately ended their relationship in November 1999 because he was working too much at the bar. Biggers testified that appellant treated her "as a boyfriend should treat a girlfriend." She acknowledged, however, that, when appellant came by to "talk" while she had a new boyfriend in her apartment, she called the police because she "wanted [appellant] escorted off to preempt any other kind of altercation that could have arose." A criminal trespass warning was issued against appellant.[11]

Emily Dreiling testified that she had spent the night at the Bahia house on two occasions, and she was never nervous. She said that she had driven from Dallas to College Station at her own expense because she "loves [appellant] to death with all [her] heart." Dreiling testified that her sister was the bookkeeper at the bar where appellant worked, and appellant was the "most dedicated employee that [she had] seen there." She further testified that appellant has "always" seemed to be able to handle his alcohol.

Shawn Lindsey, who flew from Lubbock at her own expense, testified that appellant worked with a good friend of hers. Appellant was always a "perfect gentleman" to

---

11. Biggers recently asked that the criminal trespass warrant be "waived" because she did not want it to affect appellant's trial.

her and her friends, and "he's a very upstanding young man and he made a mistake. But we all care about him very much." Appellant is "not a malicious person." Lindsey, who had not seen the video but had seen some photographs of scenes depicted in the video, testified that "I was expecting something just horrid and it's not pleasant, but it's not—It's four drunk individuals that weren't thinking or acting responsibly." The State showed Lindsey the photograph depicting appellant "penetrating an unconscious woman with a plunger handle" and asked Lindsey if she still did not regard that as "horrid." She responded that it was not "a pleasant picture." She testified that she thought the complainant acted irresponsibly by "passing out from too much alcohol."

Leon Savage, appellant's high school football special team's coach, testified that, "if [appellant] had been another color, he would have been okay" in college football. He described appellant as a "motivational leader" on the football team. Savage testified that he was "stunned" when he saw the photographs of the sexual assault, and he agreed that athletics is not an excuse for criminal conduct.

Chris Kent, the former bookkeeper for the bar where appellant worked, testified that appellant worked at the bar more than 60 hours a week. She and appellant dated for a few months, and she testified that he was always "a perfect gentleman." When asked if she had ever seen "pranking" at the Bahia house, Kent responded that appellant "kept most of that away from me, . . . out of respect for me. . . . [T]hey never took it to the level of the things that I watched on the tape . . . [b]ut that doesn't surprise me that that kind of stuff happened. I mean, it was kind of one of those things where I knew if I wasn't there that was probably what was going on." The videotape of appellant urinating on Hickman did not surprise her in any way, but she testified that appellant was "very concerned about Hickman" and was "devastated" when Hickman died. She said that she cares about appellant as would "anybody who knew him."

Janet Bardgett, appellant's high school guidance counsel, testified that appellant was in the gifted and talented program in high school. The person who committed this sexual assault is not the same person she saw in high school. Bardgett agreed that peer pressure and alcohol can cause someone to "do an act that is so contrary to their character and nature that it shocks everyone, including the person that did it."

Kim Schultze, appellant's 14–year–old sister, testified that she has always looked up to appellant, and he has always taken care of her. While a student at Texas Tech, appellant wrote to Kim and told her that he would bring her some snow.

Susan Schultze, appellant's mother, is an elementary school paraprofessional, and her husband, Gary Schultze, appellant's father, is a foreman of a construction company. She testified that appellant has always been a "super citizen" and top achiever in school. She said that athletics "was his life." Appellant had to work to afford to stay in college, and, at first, she and her husband did not approve of appellant working in a bar. Susan testified that she saw an increase in the amount of alcohol appellant consumed after the spring of 1999. Susan testified that appellant was raised to know the difference between right and wrong, he was raised in a loving family, he was never abused, and he knew how to handle his alcohol. She agreed that "there is no excuse" for what appellant did. Susan testified that she was aware that her son had been arrested on at least four occasions, and she was aware that appellant's bond supervisor in this case had notified him several times to

inform him that he was in violation of the terms of his bond.

Zunker testified that he looked up to appellant, "the leader," and was in awe of him. He testified that appellant would do things to exercise control over the group. Appellant would try to intimidate Zunker by leaving messages on his telephone saying that Zunker was "a pussy for not coming drinking with them."

Dr. James Ezelle, Jr., who practices psychiatry and psychoanalysis, testified that managing the bar gave appellant the status and power that he lost when he left football. In Ezelle's opinion, appellant "conforms to the culture that's around him" and that was particularly harmful given the fact that he had known some of the men in the Bahia house for a long time. Despite the fact that appellant is a bright, hard-working, resourceful leader, "he functions more like an adolescent in which the group has an inordinate amount of power." Ezelle acknowledged that he did not verify any of the information that appellant gave him, including the "n/a" that appellant marked on the question regarding problematic alcohol use. He agreed that, "at times of emotional stress and when his ego defenses are already compromised," appellant may engage in irresponsible and even illegal activities that will be committed "with little regard for others."

**Rebuttal Witnesses**

On rebuttal, the jury heard testimony from David Batson, the director of athletics at Texas A & M University. Batson testified that appellant was never on any sports roster at the university. He explained that there was paperwork indicating that appellant wanted to be consider for a walk-on position on the football team, but, he did not make the team.

Tommy Davis, appellant's bond supervisor from the Brazos County Community Supervision and Corrections Department, testified that appellant violated his bond in this sexual assault case in the following ways: (1) he failed to mail in report forms every week; (2) he "never [paid] a penny" despite being required to make payments; (3) not only did appellant fail to report that he had been arrested for evading arrest while on bond, he affirmatively told Davis that he had *not* been arrested; and (4) he failed to remain offense-free by getting arrested for evading arrest. Davis testified that appellant should "absolutely not" be considered for probation. When asked to explain that recommendation, Davis responded:

Three real good reasons: Number one, he was arrested for assault with bodily injury in College Station back in December 15th or 16th of 2000, was released on $20,000 bond, that case was pending when this offense took place.[12] That's one reason.

The next reason is the nature of the offense was so depraved, so demented, so deviant that this man shouldn't be on the street.

Third reason is he's demonstrated by his performance on bond supervision that he has no respect for the criminal justice system. He can't make an effort and make a payment. He can't send in a monthly report form. He can't find it in himself when he has a first degree felony pending to obey his bond conditions. I don't think he deserves probation at all.

On rebuttal, Sergeant Fleeger testified again and stated that, "based on the heinousness of the crime" and his "knowledge . . . [of] arrests of the Defendants before and after their arrests for this case," he

---

12. This refers to the assault on Bryce Pflughaupt.

did not believe the defendants deserved probation. He acknowledged that he had never recommended probation as a witness, but believed that sometimes it is appropriate.

Here, the jury heard testimony from 10 of appellant's witnesses. These witnesses all testified that they came long distances, at their own expense, to testify on behalf of appellant. The women, most of whom had dated him, testified that appellant was a "gentleman." The former coaches testified that appellant was a great athlete. His mother testified that he was a leader and knew the difference between right and wrong, and his 14–year–old sister testified that she always looked up to her brother. The medical expert testified that appellant is bright and hard-working, but is capable of irresponsible, even illegal activities with little regard for others.

In addition, the jury saw videotape evidence of appellant engaging in truly barbaric behavior—the sexual assault of an unconscious young woman—by inserting a toilet plunger handle in her vagina and suggesting that Klock and Zunker force a baseball in her vagina, while he manned the video camera. Appellant's misconduct was further emphasized by his laughter at the complainant during the assault even when her vagina was burned by a lit cigarette and a screwdriver was inserted in her vagina. During the assault, appellant declared that it was "fucking hilarious." The jurors saw the videotape appellant took of Hickman shortly before he died. They saw water being poured over his face, his penis being fondled, and his pubic hair being shaved while he lay unconscious. They saw a videotape appellant took on another occasion while he urinated on Hickman while he lay unconscious on the bed. They heard testimony from several neighbors saying that they were afraid to leave their homes. They heard testimony from several policemen who testified that the occupants of the Bahia house were not law-abiding citizens, and they heard from appellant's bond supervisor who outlined several ways in which appellant had violated the terms of his bond while trial was pending in this first degree felony case.

Accordingly, we hold with fair assurance that the trial court's error in overruling appellant's objection to the above argument did not influence the jury and did not affect his substantial rights.

We overrule point of error five.

### Jury Instruction

In point of error six, appellant argues that the trial court erred in refusing to instruct the jury at the punishment stage about the elements of the extraneous offenses the State asserted against appellant.[13]

The State presented evidence at the punishment stage that appellant had committed felony aggravated assault, evading arrest, assault, criminal mischief, and theft. The trial court denied appellant's request for a charge setting out the elements of every extraneous offense the State had asserted.

■■■■■ When a complaint is raised on appeal regarding error in the trial court's charge to the jury, a reviewing court must determine whether the charge was erroneous, and, if so, whether the error was harmful to the defendant. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The State may offer evidence of

---

13. Appellant cites no authority for his argument that the elements of extraneous offenses must be submitted to the jury.

extraneous offenses during the punishment phase of the trial. TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1). The trial court, as it did here, must charge the jury that it can only consider such evidence if it finds beyond a reasonable doubt that the defendant committed the offenses. *See Huizar v. State*, 12 S.W.3d 479, 483–84 (Tex.Crim. App.2000). There is, however, no requirement in our law that all of the statutory elements of an offense must be proven before a prior unadjudicated extraneous offense may be admitted at the punishment phase of trial. *Spence v. State*, 795 S.W.2d 743, 759 (Tex.Crim.App.1990). Because *Spence* does not require the State to prove all the elements in an extraneous offense in the punishment stage and because of the possibility that it would be confusing to the jury if the trial court submitted an instruction that included the elements of such extraneous offenses, we hold that the trial court did not err by refusing appellant's requested jury instructions. We overrule point of error six.

### Conclusion

We affirm the judgment.

Justice JENNINGS dissents.

TERRY JENNINGS, Justice, dissenting.

Because the appropriate standard for determining the harm of the State's improper punishment argument requires that this case be reversed and remanded for a new punishment hearing, I respectfully dissent.

In his fifth point of error, appellant contends that the trial court reversibly erred in allowing the State to make the following argument:

[State]: Imagine the embarrassment, the humiliation that [the complainant] had to go through. *Every time you think about the excuses* the Defendants offered, *think about* [her], what she's gone through, *what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.*

[Appellant]: Judge, I'll object. There is no evidence as to what her parents were thinking as to even their presence [sic] here in the courtroom.

[Trial Court]: Overruled.

(Emphasis added.) As conceded by the State during oral argument in this Court, there is, in fact, no evidence in the record that the complainant's parents were even living at the time of the offense or aware that the complainant had been sexually assaulted.

The law provides for, and presumes, a fair trial free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex.Crim.App.1991). It is well-settled that a prosecutor cannot use closing argument to place matters before the jury that are outside the record and prejudicial to the accused. *Everett v. State*, 707 S.W.2d 638, 641 (Tex.Crim.App.1986); *Thompson v. State*, 89 S.W.3d 843, 850 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Arguments referencing matters that are not in evidence and may not be inferred from the evidence are usually "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." *Thompson*, 89 S.W.3d at 850 (quoting *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Crim.App.1990)).

Here, the State invited the jury, "*every time*" it considered the defendants' punishment arguments, to instead focus on what her parents were "going through" and, in particular, "*what her dad is thinking knowing* that his little girl was violated in the worst way." (Emphasis added.) It is readily apparent that the State, in an effort to completely nullify the defendants'

punishment arguments, sought to inflame the "passions and prejudices of the jury," especially those members of the jury who were parents. This highly prejudicial argument was egregiously inappropriate, and the trial court gravely erred in overruling appellant's objection, an objection which so obviously should have been sustained.

Appellant concedes that the trial court's error in overruling his objection was non-constitutional and that the appropriate harm standard of review provides that such an error "that does not affect substantial rights must be disregarded." TEX. R.APP. P. 44.2(b). In *Hawkins v. State*, the Court of Criminal Appeals has recently held that determining harm under this standard concerning improper punishment argument in non-capital cases requires balancing three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the *certainty* of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed). 135 S.W.3d 72, 77 (Tex. Crim.App.2004).

In regard to the first factor, the State's argument, asking the jurors to substitute their thoughts "about . . . what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way" in place of appellant's punishment arguments, when there is absolutely no evidence whatsoever that the complainant's parents were even aware of the sexual assault, was a flagrant attempt to arouse the passion and prejudices of the jury. The degree of such misconduct is not "minimal," and, as noted above, such an argument, "designed to arouse the passion and prejudices of the jury," is "highly inappropriate." *Thompson*, 89 S.W.3d at 850 (quoting *Borjan*, 787 S.W.2d at 57).

The trial court, in regard to the second factor, made no attempt at all to correct the State's misconduct. The bottom line is that it simply failed to sustain appellant's proper objection to an obviously improper argument. Moreover, the trial court's failure to sustain appellant's objection to the argument borders on constitutional error. *See Thompson*, 89 S.W.3d 843, 852 (noting that State's argument "by urging the jury to consider matters not before them, and while effectively acknowledging that to do so was a violation of their solemn oath as jurors . . . violated the Due Process Clause of the Fourteenth Amendment and implicated the Confrontation Clause of the Sixth Amendment.").

Finally, in regard to the third factor, appellant faced the widest possible range of punishment provided for an offense in the Texas Penal Code: confinement in prison "for life or for any term of not more than 99 years or less than 5 years." TEX. PEN.CODE ANN. § 12.32 (Vernon 2003). If the jury had sentenced appellant to confinement for 10 years or less, it could have recommended to the judge that the imposition of appellant's sentence be suspended and that appellant be placed on community supervision. TEX.CODE CRIM. PROC. ANN. art. 42.12 §§ 4(a), (d)(1) (Vernon Supp. 2004–2005).

Given the wide range of possible punishment, the *certainty* of appellant's sentence, confinement for 30 years, absent the State's misconduct cannot be considered separate and apart from the severity of the State's misconduct. As noted in the majority opinion, appellant presented numerous character witnesses who testified on his behalf in the punishment phase of trial. Although, as noted in the majority opinion, the credibility of their character testimony may have been brought into question under cross-examination, an intermediate court of appeals is not a fact-finder. More importantly, the simple fact remains that the State, regardless of the actual evidence before the jury for its consideration in

assessing punishment, invited the jury, "*every time*" it considered appellant's punishment arguments to simply focus on what the complainant's parents were "going through," and, in particular, "what her dad is thinking knowing that his little girl was violated in the worst way"—matters which were not in evidence. This was not a mere "plea for law enforcement" as discussed in *Martinez v. State,* 17 S.W.3d 677, 693 (Tex.Crim.App.2000). In effect, the State argued that the jury should ignore the evidence and focus on the specific facts about the effect the offense had on the complainant's parents. Given the severity of this misconduct and its highly prejudicial nature, it cannot be said with certainty that the jury, absent the misconduct, would likely have assessed the "same punishment" of confinement for 30 years.

The facts of this case are truly ugly, but the severity of the offense did not relieve the trial court of its solemn obligation to "preserve, protect, and defend the Constitution and laws of the United States and of this State." In fulfilling this duty, we, as judges, should remember the words of Justice Felix Frankfurter: "A timid judge, like a biased judge, is intrinsically a lawless judge." *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1949) (Frankfurter, J. concurring). I cannot conclude with "fair assurance," as is required by the rule of law, that the trial court's error in overruling appellant's proper objection to the State's highly inappropriate argument "did not influence the jury, or had but a slight effect." *See Reese v. State,* 33 S.W.3d 238, 243 (Tex. Crim.App.2000). Accordingly, I would grant appellant's motion for rehearing, sustain his fifth point of error, and reverse and remand the case for a new punishment hearing.