COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                       NOS.
 2-04-594-CR

        2-04-595-CR

 

 

MARCEL JAMAR ASHFORD                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.      Introduction








Appellant Marcel Jamar
Ashford was charged by three indictments with the aggravated robberies of
Venkateshwar Seri, Guy Shambo, and Erica Ayers. 
All three cases were tried together. 
A jury found Appellant not guilty of the aggravated robbery of Seri, but
it convicted him of the aggravated robberies of Shambo and Ayers and assessed
his punishment at thirty-five years= confinement and a $5,000 fine for each offense.  In six points, Appellant contends that the
trial court erred in allowing extraneous offense evidence in violation of Texas
Rules of Evidence 404(b) and 403 and that the evidence is legally and factually
insufficient to support the conviction. 
We affirm. 

II.     Review
of Evidence

On December 4 and December 6,
2003, several armed robberies occurred in Denton, Texas. 

Jessie Brice=s Apartment








At approximately 9:00 p.m. on
December 4, 2003, Jessie Brice heard a knock on his apartment door.  When he opened the door, a man wearing a Ablack sweatshirt-type-jacket-thing@ stepped inside, followed by another man wearing a black sweatshirt
with a hood.  Because neither man had his
face covered, Brice was later able to identify the men as Appellant and Paul
Brown, Appellant=s girlfriend=s brother.  Brice testified that
Appellant struck him in the face with an automatic pistol.  He was then held to the floor as
approximately five or six more men dressed in black hooded sweatshirts came
into the apartment.  Some of the men were
wearing bandannas over their faces, while others were wearing ski masks.  They grabbed Brice=s girlfriend by the hair and took her to the back of the
apartment.  They then took Brice to the
kitchen, tied him up, and kicked him in the face four or five times.  Finally, according to Brice, they Atook whatever they wanted,@ including Brice=s truck, and
left.  

At trial, the prosecutor
showed Brice several photographs, State=s Exhibits 2, 3, and 4.  State=s Exhibits 2 and 3 were photographs taken from the video of an armed
robbery that occurred on December 6, 2003, at the Exel Inn.  State=s Exhibit 4 was a photograph taken from the video of an armed robbery
that occurred on December 6, 2003, at the EZ Check store located at 525 Eagle
Drive (AEZ Check 525").  When asked
whether the individuals in the photographs showed how Appellant was dressed on
the night that he came into the apartment, Brice stated that the man behind the
cash register in each photograph was dressed like Appellant, except that
Appellant was not wearing a hat or bandanna. 
Brice also agreed during cross-examination that two of the other men in
the photographs were dressed similarly to the way Appellant was dressed. 

CITGO Gas Station








Shortly after the armed
robbery at Brice=s apartment,
two black men, wearing dark-colored clothing and bandannas over their faces,
entered the CITGO gas station located at 1724 Bernard Street where Venkateshwar
Seri and Juan Areanas were working.  Seri
testified that one of the men pointed a gun at him and demanded that he open
the cash register.  Meanwhile, the other
man came behind the counter and took the money from the register along with a
number of lottery tickets and Seri=s wallet.  Further, he made Seri
lie down and then kicked him.  Areanas
testified that the man holding the gun[2]
ordered him to Aget to the
floor.@  After Areanas had done so, the
other man took his wallet.  Finally, Seri
and Areanas both heard a gunshot as the men left the store. 

At trial, Seri testified that
the individuals in State=s Exhibits
2, 3, and 4 were wearing dark clothes similar to those of the men who robbed
him.  He also stated, however, that he
did not recognize the men who robbed him because they were all wearing masks. 

Exel Inn

On December 6, 2003, four
armed black men, wearing black hoods and bandannas or masks over their faces,
entered the lobby of the Exel Inn.  The
men pointed their guns at Bernest Lott, the motel=s night auditor, and Evan Spurrier, the desk clerk, and demanded  money. 
One of the men in particular, wearing a cap and a bandanna over his
face, jumped over the counter and took the money from the cash register
drawer.  The men also took Lott=s wallet and the money from the Alittle bank@ located in
the back office of the motel. 








After the men had left,
Spurrier called Jennifer Molden-Hauer, the motel=s general manager, and informed her that the motel had just been
robbed. Molden-Hauer immediately drove to the motel.  When she arrived, she viewed the videotaped recording
of the event.  At trial, she identified
the videotape as the original recording, and it was admitted into evidence. 

EZ Check Store, 811
Eagle Drive

Around 11:30 p.m. the same
night, four black men, wearing black hooded sweatshirts and masks, came into
the EZ Check store located at 811 Eagle Drive (AEZ Check 811"), where Muhammad Hussein and Felipe Lopez Perez
were working.  Perez testified that the
men grabbed him, pressed a gun to his chest, and told him not to move.  One of the men then hit him in the head,
knocked him to the floor, and pointed the gun at his head. 








Erica Ayers had gone to the
EZ Check 811 that night.  She testified
that when she entered the store, she immediately went to the cooler and got a
soft drink.  As she turned around toward
the counter, she saw an armed black man coming toward her.  He was wearing a black ski mask, a Ablack-gray-sweater-looking thing@ with a hood, and dirty black pants. 
Ayers testified that he was dressed similarly to the individuals in
State=s Exhibit 2.  When he got to
her, he pressed a gun, which looked like a revolver, against her side, told her
to get down on the floor, and demanded that she give him her purse.  She handed him her purse and stretched out on
the floor.  Her purse contained her
credit cards, two checkbooks, her cell phone, and her driver=s license.  

Guy Shambo and Eric Pettigrew
had also gone to the EZ Check 811 that night. 
Shambo testified that as he entered the store, someone grabbed his
shoulders from behind and threw him on the ground.  The person told him not to move and then took
his wallet, which contained his debit card. 

Pettigrew testified that
after Shambo had stepped inside the store, he saw two black men dressed in
black clothing with black hoods and masks over their faces coming toward them,
telling them to get on the ground. 
Pettigrew observed Aa black male wearing all black with a navy-colored bandanna over his
face@ shove Shambo to the ground. 
When the other man tried to grab him, Pettigrew ran outside and called
911.  At trial, he testified that he had
also observed two other individuals in the store, one behind the counter,
wearing a ball cap and a bandanna over his face, and another in front of the
counter.    








The State showed State=s Exhibits 2, 3, and 4 to Pettigrew. 
He testified that the way the individuals were dressed in State=s Exhibit 2 was Aexactly@ what he remembered from that night. 
He stated that the two men wearing hoods in State=s Exhibit 2 resembled the two men who came toward him in the
store.  Furthermore, Pettigrew testified
that the man behind the counter taking the money in State=s Exhibits 2, 3, and 4 appeared to be the same man at the EZ Check 811
who was behind the counter taking the money. 


EZ Check Store, 525
Eagle Drive

At approximately 11:40 or
11:45 p.m. on December 6, 2003, two men wearing masks came into the EZ Check
525, where Golam Haider was working. One man pointed a gun at Haider and told
him to open the cash register drawer. The other man went behind the counter to
get the money from the drawer and Haider=s wallet.[3]  At trial, Haider identified the videotape of
the recording of the crime, and it was admitted into evidence. 

Additional Evidence








On December 7, 2003, at 1:45
a.m. and again at 1:47 a.m., a little more than two hours after Guy Shambo=s debit card was stolen along with his wallet at the EZ Check 811,
Appellant, wearing a blue baseball cap and a white South Pole jacket with the
number twenty-one on it, was seen on a surveillance video unsuccessfully
attempting to use Shambo=s debit card
at a Chevron station in Dallas. 
Additionally, on December 7, 2003, Jessie Brice=s truck was found on Scotland Street in South Dallas, near Appellant=s mother=s home, the
house where Appellant lived with his girlfriend, and the Chevron station where
he was seen attempting to use Shambo=s debit card.   

On December 23, 2003, Juan
Salazar, Sr., went to South Oak Cliff High School for a glass repair job.  A woman arrived driving a 2001 Chevy Impala
(license plate number T84BSY); Appellant arrived driving a 1985 Oldsmobile
Delta 88.  After Salazar performed
repairs on the windows of both cars, the woman paid for the repairs with one of
Erica Ayers=s checks,
which had been taken in the robbery at the EZ Check 811.  








On January 14, 2004, six
police officers, including Detective William Ford of the Dallas Police
Department, went to Appellant=s mother=s home in
pursuit of a suspect in an unrelated matter whom they believed had fled on foot
to the residence.  Appellant came from
across the street on a bicycle to find out what was going on at the house.  Detective Ford instructed him to go back
across the street until they were finished searching in and around the
house.  Detective Ford then noticed
Appellant=s mother
removing the keys from a maroon 2001 Chevy Impala (license plate number
T84BSY).  Detective Ford requested that
she move the car because it was blocking the sidewalk.  She indicated that the car belonged to
someone else and walked back into the house.[4]  Thus, Detective Ford and his partner decided
to have the car towed.  As standard
policy of the Dallas Police Department, the police inventoried the car.  Detective Ford found several items linking
Appellant to the car, including a speeding ticket and various pieces of mail
addressed to Appellant.  Detective Ford
also found a .22-caliber handgun,[5]
Erica Ayers=s driver=s license, and one of her checks. 

Detective Ford contacted the
Denton Police Department.  Together with
Detective Kevin Smith of the Denton Police Department, he looked at the various
pictures and videos related to the robberies.[6]  After looking at the video and the
photographs from the surveillance camera at the Chevron station, the detectives
identified Appellant as the man at the ATM machine attempting to use Shambo=s debit card.  As a result,
several arrest warrants were issued for Appellant. 








Detective Ford testified that
an arrest warrant was executed at the home where Appellant and his girlfriend,
Teresa Brown, were living.  After
Appellant had been placed in custody, Detective Ford received permission from
Brown to search the home.  Although
Detective Ford testified that he did not find any dark clothing matching the
description of what the men committing the robberies were wearing, he did
recover several items that he believed were related to the aggravated robberies
in Denton, including two blue baseball caps, a white jacket, and a bulletproof
vest.[7]  Detective Ford testified that he believed the
jacket and caps matched the jacket and cap that Appellant was wearing in the
photographs from the surveillance video at the Chevron station.  He stated that it is uncommon to find plain
blue baseball caps that are not labeled in any way. 

Subsequently, Investigator
Parkey obtained a search warrant for the 2001 Chevy Impala.  When detectives executed the warrant, they
found another one of Erica Ayers=s checks and several scratch-off lottery tickets that had been stolen
from the CITGO gas station.[8]  The detectives also found several documents
linking Appellant to the car, including some personal notes and several
citations from law enforcement agencies written in Appellant=s name. 

Appellant=s Testimony








Appellant testified on his
own behalf at trial.  He stated that in
the early morning hours of December 7, 2003, he was Amaking rounds, selling narcotics@ when one of his regular customers, known as ASmurf,@ called him,
wanting to buy drugs.  About ten minutes
later, Appellant met Smurf and his female companion at a local motel, where he
sold Smurf Aa
substantial amount of drugs@ in exchange for some lottery tickets. 
Appellant stated that it was not unusual to sell drugs for something
other than cash.  Smurf then asked
Appellant to take him to the corner store. 
Appellant agreed and then dropped Smurf and his female companion back at
the motel afterward.  Appellant testified
that about thirty minutes had passed from the moment he first showed up at the
motel until the time he dropped them back off at the motel. 








Approximately thirty or forty
minutes later, Smurf called Appellant again to make another drug purchase.  Appellant went to the same motel where they
had previously met.  To pay for more
drugs, Smurf presented Appellant with Guy Shambo=s debit card.  Appellant was to
go to the ATM at the Chevron station, take out approximately seventy or eighty
dollars using the PIN number that Smurf gave him, and then bring the debit card
back to Smurf.  Appellant went to the
Chevron station and unsuccessfully tried twice to use the debit card.  When he was unable to use the card, he made
several other purchases and then took the debit card back to Smurf.  As Appellant returned the debit card, Smurf=s female companion said that she had previously noticed a crack in his
car window.  She proposed that she pay to
fix the window in exchange for drugs. 
Appellant agreed and gave them approximately seventy-five dollars= worth of crack cocaine.[9]  

Several weeks later, they
called Appellant again, wanting to purchase more drugs.  Appellant met them at a different motel.  When Appellant arrived, the woman asked him
if he was still ready to get his car window fixed.  Appellant replied that he was; therefore,
they went to South Oak Cliff High School. 
Appellant testified that he let the woman drive his car because she had
called in the order and was going to pay for it.  Appellant drove a friend=s car. At the high school, a man arrived and fixed the windshield of
Appellant=s car. The
woman then paid him with a check. 
Appellant stated that the woman must have left Erica Ayers=s check and driver=s license in his car sometime that day. 








On January 27, 2004,
Appellant was arrested at his girlfriend=s house. Appellant testified that the jacket and one of the blue
baseball caps found in the search of the house belonged to him and that it was
what he was wearing at the Chevron station when he had attempted to use Shambo=s debit card.  He testified that
it was not uncommon for him to own a plain blue baseball cap; in fact, over
half of the people in his family had identical baseball caps.  Appellant did acknowledge, however, that the
cap looked a lot like the cap that the man was wearing in the photographs of
the robberies.   

With regard to the other blue
baseball cap found in the search, Appellant testified that it did not belong to
him.  Furthermore, he did not know to
whom the bulletproof vest belonged.  He
stated that his girlfriend, his girlfriend=s brother Paul Brown, and his girlfriend=s sister-in-law all also had access to the house.  Moreover, Appellant stated that he did not
know anything about the handgun found in the car. 

Finally, Appellant testified
that, unlike him, the man wearing the blue cap in the photographs of the
robberies did not have long hair. 
Appellant stated that during December 2003 and January 2004, he wore his
hair in braids.  Ultimately, Appellant
testified that on both days at about the time the robberies were occurring, he
was in Dallas selling drugs. 

III.     Extraneous
Offense Evidence

Unindicted Robberies








In his first three points,
Appellant contends that the trial court erred in allowing extraneous offense
evidence relating to the unindicted aggravated robberies at Jessie Brice=s apartment, the Exel Inn, and the EZ Check 525 in violation of Texas
Rules of Evidence 404(b) and 403. 

Appellant filed a motion in
limine regarding, among other things, the three unindicted offenses in
question.  At the pretrial hearing on the
motion, Appellant argued that the evidence of the unindicted robberies was
inadmissible and asked the court to grant the motion in limine because allowing
the evidence Awould allow
the State to avoid having to indict a weak case just by kind of bootstrapping
it to stronger cases and using it to find him guilty anyway@ and because the prejudicial effect of the evidence outweighed the
probative value. The trial court specifically denied the motion with regard to
the three unindicted offenses. 

To the extent that Appellant
contends that this motion and hearing preserved any error, we disagree.  The denial of a motion in limine is not
sufficient to preserve error for review; Appellant must have objected on the
proper grounds when the evidence was offered during trial.  Harrington v. State, 547 S.W.2d 616, 620
(Tex. Crim. App. 1977); Scherl v. State, 7 S.W.3d 650, 654 (Tex. App.CTexarkana 1999, pet. ref=d). 








At trial, an objection must be made as soon as the basis
for the objection becomes apparent.  Tex. R. Evid. 103(a)(1); Lagrone v.
State, 942 S.W.2d 602, 618 (Tex. Crim. App.), cert. denied, 522 U.S.
917 (1997); Polk v. State, 729 S.W.2d 749, 753 (Tex. Crim. App.
1987).  Further, to preserve error, a
party must continue to object each time the objectionable evidence is
offered.  Fuentes v. State, 991
S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington
v. State, 819 S.W.2d 854, 858-59 (Tex. Crim. App. 1991).  A trial court=s erroneous
admission of evidence will not require reversal when other such evidence was
received without objection, either before or after the complained-of
ruling.  Leday v. State, 983
S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991).  This rule
applies whether the other evidence was introduced by the defendant or the
State.  Leday, 983 S.W.2d at 718.

Here, as the State points
out, Appellant did not make a Rule 404(b) or a Rule 403 objection to Jessie
Brice=s testimony describing the unindicted robbery at his apartment,
Bernest Lott=s testimony
describing the unindicted robbery at the Exel Inn, Golam Haider=s testimony describing the unindicted robbery at the EZ Check 525, or
police investigators= testimony
mentioning the unindicted robberies. 
Thus, he has forfeited his complaint that this testimonial evidence
violated Rule 404(b) and Rule 403.  See
Tex. R. App. P. 33.1(a). 








Appellant did object on
relevance grounds to the admission of the video recordings of the robberies at
both the Exel Inn and the EZ Check 525, because the recordings related to
unindicted offenses.  However, immediately
following the admission of the video recording of the robbery at the Exel Inn,
Bernest Lott described the armed robbery in detail without any objection.  Likewise, immediately before the admission of
the video recording of the armed robbery at the EZ Check 525, Golam Haider
described the armed robbery in detail without Appellant=s making a Rule 404(b) or Rule 403 objection.  Therefore, Appellant has forfeited his
complaint that the two video recordings violated Rule 404(b) and Rule 403.  See Leday, 983 S.W.2d at
718; Johnson, 803 S.W.2d at 291.      








Finally, Appellant made a
general relevance objection to State=s Exhibits 2, 3, and 4, photographs taken from the videos of the
robberies at the Exel Inn and the EZ Check 525. 
As stated previously, the robberies depicted in these pictures had been
described in detail without a Rule 404(b) or Rule 403 objection.  Furthermore, the court of criminal appeals
has made it clear that a general relevancy objection at trial does not preserve
error concerning a Rule 404(b) extraneous offense claim.  See Medina v. State, 7 S.W.3d 633,
643 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1102 (2000) (holding
that a relevancy trial objection did not preserve error concerning a Rule 404
extraneous offense claim); Camacho v.
State, 864 S.W.2d 524, 533 (Tex. Crim. App.
1993), cert. denied, 510 U.S. 1215 (1994) (holding that hearsay and relevancy
trial objections did not preserve a Rule 404(b) extraneous offense claim on
appeal).  Moreover, a Rule 403 objection
is not implicitly contained within a relevancy objection; rather, a separate
Rule 403 objection must be lodged to preserve error.  Montgomery v. State, 810 S.W.2d 372,
388 (Tex. Crim. App. 1991) (op. on reh=g); Schultze v.
State, 177 S.W.3d 26, 40 (Tex. App.CHouston [1st
Dist.] 2005, pet. ref=d). 


Therefore, because Appellant failed
to make the proper objections at trial, we overrule Appellant=s first three points.

Bulletproof Vest

In his fourth point,
Appellant contends that the trial court erred in admitting extraneous offense
evidence of a bulletproof vest in violation of Texas Rules of Evidence 404(b)
and 403. 

When the State offered the
bulletproof vest into evidence, Appellant objected that it was not
relevant.  The trial court overruled the
objection and admitted the vest into evidence. 
No other objections regarding the bulletproof vest were made.  








An objection stating one
legal theory may not be used to support a different legal theory on
appeal.  Chambers v. State, 903
S.W.2d 21, 32 (Tex. Crim. App. 1995); Camacho, 864 S.W.2d at 533.  And as previously stated, a general
relevance objection at trial does not preserve a Rule 404(b) extraneous offense
claim.  See Medina, 7 S.W.3d at
643; Camacho, 864 S.W.2d at 533. 
Moreover, as stated, a Rule 403 objection is not implicitly contained
within a relevancy objection; rather, a separate Rule 403 objection must be
lodged to preserve error.  Montgomery,
810 S.W.2d at 388; Schultze, 177 S.W.3d at 40.  Appellant failed to make the proper
objections at trial; therefore, we overrule his fourth point.

IV.    Legal
and Factual Sufficiency

In his fifth and sixth
points, Appellant contends that the evidence is legally and factually
insufficient to support his conviction.

Standards of Review








In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The standard of review is the same for direct
and circumstantial evidence cases.  Burden
v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner v. State,
994 S.W.2d 180, 184 (Tex. Crim. App. 1999).








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 
      In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency
review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).  A factual sufficiency review of
circumstantial evidence is the same as a review of direct evidence.  King v. State, 29 S.W.3d 556, 565
(Tex. Crim. App. 2000); Kutzner, 994 S.W.2d at 184.








 

 

Analysis

Appellant argues that the
evidence is legally and factually insufficient to prove that he committed the
two aggravated robberies of which he was convicted.  We disagree.

The trial court=s charge in both cases instructed the jury that Appellant could be
found guilty of the offense either as the principal or as a party.  In both cases the jury returned a general
verdict of guilty.  The guilty verdict
will be upheld if the evidence is sufficient under any one of the theories
submitted.  Swearingen v. State,
101 S.W.3d 89, 95 (Tex. Crim. App. 2003); Rabbani v. State, 847 S.W.2d
555, 558 (Tex. Crim. App. 1992), cert. denied, 509 U.S. 926 (1993).








A person commits the offense
of aggravated robbery if, in the course of committing theft and with intent to
obtain or maintain control of the property, he intentionally or knowingly
threatens or places another in fear of imminent bodily injury or death and uses
or exhibits a deadly weapon.  Tex. Penal Code Ann. '' 29.02(a)(2), 29.03(a)(2) (Vernon 2003).  A person is criminally responsible for an
offense as a party if, acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense.  Id.
' 7.02(a)(2).

Viewed in the light most
favorable to the verdict, the evidence shows as follows.[10]  Jessie Brice identified Appellant as one of
the men involved in the armed robbery at his apartment.  He further testified that Appellant was
dressed similarly to the man behind the cash register in State=s Exhibits 2, 3, and 4, photographs taken from the videos of the armed
robberies at the Exel Inn and the EZ Check 525. 
Eric Pettigrew, a witness to the armed robbery at the EZ Check 811,
stated that the man behind the counter in State=s Exhibits 2, 3, and 4 appeared to be the same man behind the counter
at the EZ Check 811 and that the way the individuals were dressed in State=s Exhibit 2 was Aexactly@ what he remembered.  








Appellant was also found to
be in possession of property taken during the robberies.  See Hunt v. State, No. 05-91-01041-CR
to 05-91-01044-CR, 1992 WL 352939, at *3 (Tex. App.CDallas Nov. 19, 1992, pet. ref=d) (not designated for publication) (APossession of property may be circumstantial evidence of guilt.@).  Approximately two
hours after Guy Shambo=s debit card
was stolen at the EZ Check 811 in Denton, Appellant attempted to use the debit
card at a Chevron station in Dallas. 
Approximately two and a half weeks after Erica Ayers=s purse was stolen at the EZ Check 811, Appellant accompanied a woman
to South Oak Cliff High School, where she paid for repairs to his car window
with one of Ayers=s stolen
checks.  Investigators later inventoried
the same car and found a .22-caliber handgun, Ayers=s driver=s license,
and another one of Ayers=s
checks.  In another search of the car
pursuant to a search warrant, investigators found another one of Ayers=s checks and several scratch-off lottery tickets that had been stolen
from the CITGO gas station. 

Finally, in the search of the
home where Appellant and his girlfriend were living, police investigators
recovered two blue baseball caps, one of which Appellant admitted belonged to
him.  Detective Ford stated that it is
uncommon to find plain blue baseball caps that are not labeled in any way, and
Appellant acknowledged that it resembled the cap that one of the men in the pictures
of the robberies was wearing.  








In light of the foregoing, we
hold that the evidence is legally sufficient to support the verdict that
Appellant is guilty of the aggravated robberies of Shambo and Ayers.  We next turn to the factual sufficiency of the
evidence. 

In response to the evidence
detailed above in support of Appellant=s participation in the robberies of Shambo and Ayers, Appellant
testified that on both days at about the time the robberies were occurring, he
was in Dallas selling drugs.  He stated
that the man wearing the blue cap in the pictures of the robberies did not have
long hair; whereas, he had long hair at the time and wore his hair in
braids.  Furthermore, Appellant testified
that it would not be uncommon for him to own a plain blue baseball cap; in
fact, over half of the people in his family had identical baseball caps. 

Appellant also gave an
explanation for having the stolen property in his possession.  He testified that through his drug dealing
with Smurf, he came into possession of the stolen lottery tickets from the
CITGO store, Erica Ayers=s driver=s license, her checks, and Guy Shambo=s debit card.  Furthermore,
Appellant claimed he had no knowledge of the gun that was found in his car. 








As previously stated, in
performing a factual sufficiency review, we are to give deference to the fact
finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Zuniga,
144 S.W.3d at 481; Cain, 958 S.W.2d at 407.  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  Therefore, viewing the evidence in a neutral
light, we cannot say that the evidence supporting the verdict is too weak to
support the finding of guilty beyond a reasonable doubt or that the contrary
evidence is so strong that guilt cannot be proven beyond a reasonable
doubt.  See Zuniga, 144 S.W.3d at
484-85.  We overrule Appellant=s fifth and sixth points.

V.     Conclusion

Having overruled Appellant=s six points on appeal, we affirm the trial court=s judgments.

 

 

ANNE GARDNER

JUSTICE

 

PANEL F:    DAUPHINOT, HOLMAN, and GARDNER, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  April 6, 2006











[1]See Tex. R. App. P. 47.4.





[2]Areanas
stated that he thought the gun was a revolver. 





[3]Haider=s
wallet was not taken, however, because he had no money in it. 





[4]It
was later discovered that the car was registered to Appellant=s
grandmother. 





[5]Detective
Ford testified that, based on his recollection, the gun was a revolver, but it
could have been an automatic. 
Unfortunately, by the time of trial, the gun had been destroyed. 





[6]Detective
Smith and Investigator Benny Parkey, also of the Denton Police Department,
testified that the robberies were investigated together because they were
believed to be related.  





[7]Detective
Ford also testified, however, that none of the participants in any of the
robberies were described as wearing a bulletproof vest.  





[8]Three
of the other stolen tickets were cashed in Denton the morning after they were
stolen. 





[9]Appellant
testified that the woman told him it would cost anywhere from two hundred to
three hundred dollars to have the glass fixed, and Appellant agreed to give
them half of that amount in drugs that night. 





[10]Appellant
appears to argue that we may only consider evidence of guilt presented by the
State in a legal sufficiency review. 
However, we are to consider all the evidence that sustains the
conviction, whether submitted by the prosecution or defense, in determining the
legal sufficiency of the evidence.  Clewis
v. State, 922 S.W.2d 126, 132 n.10 (Tex. Crim. App. 1996); Cook v. State,
858 S.W.2d 467, 470 (Tex. Crim. App. 1993); Adams v. State, 180 S.W.3d
386, 413 (Tex. App.CCorpus
Christi 2005, no pet.).