ASHFORD V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NOS.  2-04-594-CR

        2-04-595-CR

MARCEL JAMAR ASHFORD APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Marcel Jamar Ashford was charged by three indictments with the aggravated robberies of Venkateshwar Seri, Guy Shambo, and Erica Ayers.  All three cases were tried together.  A jury found Appellant not guilty of the aggravated robbery of Seri, but it convicted him of the aggravated robberies of Shambo and Ayers and assessed his punishment at thirty-five years’ confinement and a $5,000 fine for each offense.  In six points, Appellant contends that the trial court erred in allowing extraneous offense evidence in violation of Texas Rules of Evidence 404(b) and 403 and that the evidence is legally and factually insufficient to support the conviction.  We affirm. 

II. Review of Evidence

On December 4 and December 6, 2003, several armed robberies occurred in Denton, Texas.
 

Jessie Brice’s Apartment

At approximately 9:00 p.m. on December 4, 2003, Jessie Brice heard a knock on his apartment door.  When he opened the door, a man wearing a “black sweatshirt-type-jacket-thing” stepped inside, followed by another man wearing a black sweatshirt with a hood.  Because neither man had his face covered, Brice was later able to identify the men as Appellant and Paul Brown, Appellant’s girlfriend’s brother.  Brice testified that Appellant struck him in the face with an automatic pistol.  He was then held to the floor as approximately five or six more men dressed in black hooded sweatshirts came into the apartment.  Some of the men were wearing bandannas over their faces, while others were wearing ski masks.  They grabbed Brice’s girlfriend by the hair and took her to the back of the apartment.  They then took Brice to the kitchen, tied him up, and kicked him in the face four or five times.  Finally, according to Brice, they “took whatever they wanted,” including Brice’s truck, and left.  

At trial, the prosecutor showed Brice several photographs, State’s Exhibits 2, 3, and 4.  State’s Exhibits 2 and 3 were photographs taken from the video of an armed robbery that occurred on December 6, 2003, at the Exel Inn.  State’s Exhibit 4 was a photograph taken from the video of an armed robbery that occurred on December 6, 2003, at the EZ Check store located at 525 Eagle Drive (“EZ Check 525").  When asked whether the individuals in the photographs showed how Appellant was dressed on the night that he came into the apartment, Brice stated that the man behind the cash register in each photograph was dressed like Appellant, except that Appellant was not wearing a hat or bandanna.  Brice also agreed during cross-examination that two of the other men in the photographs were dressed similarly to the way Appellant was dressed. 

CITGO Gas Station

Shortly after the armed robbery at Brice’s apartment,
 two black men, wearing dark-colored clothing and bandannas over their faces, entered the CITGO gas station located at 1724 Bernard Street where Venkateshwar Seri and Juan Areanas were working.  Seri testified that one of the men pointed a gun at him and demanded that he open the cash register.  Meanwhile, the other man came behind the counter and took the money from the register along with a number of lottery tickets and Seri’s wallet.  Further, he made Seri lie down and then kicked him.  Areanas testified that the man holding the gun
(footnote: 2) ordered him to “get to the floor.”  After Areanas had done so, the other man took his wallet.  Finally, Seri and Areanas both heard a gunshot as the men left the store. 

At trial, Seri testified that the individuals in State’s Exhibits 2, 3, and 4 were wearing dark clothes similar to those of the men who robbed him.  He also stated, however, that he did not recognize the men who robbed him because they were all wearing masks. 

Exel Inn

On December 6, 2003, four armed black men, wearing black hoods and bandannas or masks over their faces, entered the lobby of the Exel Inn.  The men pointed their guns at Bernest Lott, the motel’s night auditor, and Evan Spurrier, the desk clerk, and demanded  money.  One of the men in particular, wearing a cap and a bandanna over his face, jumped over the counter and took the money from the cash register drawer.  The men also took Lott’s wallet and the money from the “little bank” located in the back office of the motel. 

After the men had left, Spurrier called Jennifer Molden-Hauer, the motel’s general manager, and informed her that the motel had just been robbed. Molden-Hauer immediately drove to the motel.  When she arrived, she viewed the videotaped recording of the event.  At trial, she identified the videotape as the original recording, and it was admitted into evidence. 

EZ Check Store, 811 Eagle Drive

Around 11:30 p.m. the same night, four black men, wearing black hooded sweatshirts and masks, came into the EZ Check store located at 811 Eagle Drive (“EZ Check 811"), where Muhammad Hussein and Felipe Lopez Perez were working.  Perez testified that the men grabbed him, pressed a gun to his chest, and told him not to move.  One of the men then hit him in the head, knocked him to the floor, and pointed the gun at his head. 

Erica Ayers had gone to the EZ Check 811 that night.  She testified that when she entered the store, she immediately went to the cooler and got a soft drink.  As she turned around toward the counter, she saw an armed black man coming toward her.  He was wearing a black ski mask, a “black-gray-sweater-looking thing” with a hood, and dirty black pants.  Ayers testified that he was dressed similarly to the individuals in State’s Exhibit 2.  When he got to her, he pressed a gun, which looked like a revolver, against her side, told her to get down on the floor, and demanded that she give him her purse.  She handed him her purse and stretched out on the floor.  Her purse contained her credit cards, two checkbooks, her cell phone, and her driver’s license.  

Guy Shambo and Eric Pettigrew had also gone to the EZ Check 811 that night.  Shambo testified that as he entered the store, someone grabbed his shoulders from behind and threw him on the ground.  The person told him not to move and then took his wallet, which contained his debit card. 

Pettigrew testified that after Shambo had stepped inside the store, he saw two black men dressed in black clothing with black hoods and masks over their faces coming toward them, telling them to get on the ground.  Pettigrew observed “a black male wearing all black with a navy-colored bandanna over his face” shove Shambo to the ground.  When the other man tried to grab him, Pettigrew ran outside and called 911.  At trial, he testified that he had also observed two other individuals in the store, one behind the counter, wearing a ball cap and a bandanna over his face, and another in front of the counter.    

The State showed State’s Exhibits 2, 3, and 4 to Pettigrew.  He testified that the way the individuals were dressed in State’s Exhibit 2 was “exactly” what he remembered from that night.  He stated that the two men wearing hoods in State’s Exhibit 2 resembled the two men who came toward him in the store.  Furthermore, Pettigrew testified that the man behind the counter taking the money in State’s Exhibits 2, 3, and 4 appeared to be the same man at the EZ Check 811 who was behind the counter taking the money.  

EZ Check Store, 525 Eagle Drive

At approximately 11:40 or 11:45 p.m. on December 6, 2003, two men wearing masks came into the EZ Check 525, where Golam Haider was working. One man pointed a gun at Haider and told him to open the cash register drawer. The other man went behind the counter to get the money from the drawer and Haider’s wallet.
(footnote: 3)  At trial, Haider identified the videotape of the recording of the crime, and it was admitted into evidence. 

Additional Evidence

On December 7, 2003, at 1:45 a.m. and again at 1:47 a.m., a little more than two hours after Guy Shambo’s debit card was stolen along with his wallet at the EZ Check 811, Appellant, wearing a blue baseball cap and a white South Pole jacket with the number twenty-one on it, was seen on a surveillance video unsuccessfully attempting to use Shambo’s debit card at a Chevron station in Dallas.  Additionally, on December 7, 2003, Jessie Brice’s truck was found on Scotland Street in South Dallas, near Appellant’s mother’s home, the house where Appellant lived with his girlfriend, and the Chevron station where he was seen attempting to use Shambo’s debit card.   

On December 23, 2003, Juan Salazar, Sr., went to South Oak Cliff High School for a glass repair job.  A woman arrived driving a 2001 Chevy Impala (license plate number T84BSY); Appellant arrived driving a 1985 Oldsmobile Delta 88.  After Salazar performed repairs on the windows of both cars, the woman paid for the repairs with one of Erica Ayers’s checks, which had been taken in the robbery at the EZ Check 811.  

On January 14, 2004, six police officers, including Detective William Ford of the Dallas Police Department, went to Appellant’s mother’s home in pursuit of a suspect in an unrelated matter whom they believed had fled on foot to the residence.  Appellant came from across the street on a bicycle to find out what was going on at the house.  Detective Ford instructed him to go back across the street until they were finished searching in and around the house.  Detective Ford then noticed Appellant’s mother removing the keys from a maroon 2001 Chevy Impala (license plate number T84BSY).  Detective Ford requested that she move the car because it was blocking the sidewalk.  She indicated that the car belonged to someone else and walked back into the house.
(footnote: 4)  Thus, Detective Ford and his partner decided to have the car towed.  As standard policy of the Dallas Police Department, the police inventoried the car.  Detective Ford found several items linking Appellant to the car, including a speeding ticket and various pieces of mail addressed to Appellant.  Detective Ford also found a .22-caliber handgun,
(footnote: 5) Erica Ayers’s driver’s license, and one of her checks. 

Detective Ford contacted the Denton Police Department.  Together with Detective Kevin Smith of the Denton Police Department, he looked at the various pictures and videos related to the robberies.
(footnote: 6)  After looking at the video and the photographs from the surveillance camera at the Chevron station, the detectives identified Appellant as the man at the ATM machine attempting to use Shambo’s debit card.  As a result, several arrest warrants were issued for Appellant. 

Detective Ford testified that an arrest warrant was executed at the home where Appellant and his girlfriend, Teresa Brown, were living.  After Appellant had been placed in custody, Detective Ford received permission from Brown to search the home.  Although Detective Ford testified that he did not find any dark clothing matching the description of what the men committing the robberies were wearing, he did recover several items that he believed were related to the aggravated robberies in Denton, including two blue baseball caps, a white jacket, and a bulletproof vest.
(footnote: 7)  Detective Ford testified that he believed the jacket and caps matched the jacket and cap that Appellant was wearing in the photographs from the surveillance video at the Chevron station.  He stated that it is uncommon to find plain blue baseball caps that are not labeled in any way. 

Subsequently, Investigator Parkey obtained a search warrant for the 2001 Chevy Impala.  When detectives executed the warrant, they found another one of Erica Ayers’s checks and several scratch-off lottery tickets that had been stolen from the CITGO gas station.
(footnote: 8)  The detectives also found several documents linking Appellant to the car, including some personal notes and several citations from law enforcement agencies written in Appellant’s name. 

Appellant’s Testimony

Appellant testified on his own behalf at trial.  He stated that in the early morning hours of December 7, 2003, he was “making rounds, selling narcotics” when one of his regular customers, known as “Smurf,” called him, wanting to buy drugs.  About ten minutes later, Appellant met Smurf and his female companion at a local motel, where he sold Smurf “a substantial amount of drugs” in exchange for some lottery tickets.  Appellant stated that it was not unusual to sell drugs for something other than cash.  Smurf then asked Appellant to take him to the corner store.  Appellant agreed and then dropped Smurf and his female companion back at the motel afterward.  Appellant testified that about thirty minutes had passed from the moment he first showed up at the motel until the time he dropped them back off at the motel. 

Approximately thirty or forty minutes later, Smurf called Appellant again to make another drug purchase.  Appellant went to the same motel where they had previously met.  To pay for more drugs, Smurf presented Appellant with Guy Shambo’s debit card.  Appellant was to go to the ATM at the Chevron station, take out approximately seventy or eighty dollars using the PIN number that Smurf gave him, and then bring the debit card back to Smurf.  Appellant went to the Chevron station and unsuccessfully tried twice to use the debit card.  When he was unable to use the card, he made several other purchases and then took the debit card back to Smurf.  As Appellant returned the debit card, Smurf’s female companion said that she had previously noticed a crack in his car window.  She proposed that she pay to fix the window in exchange for drugs.  Appellant agreed and gave them approximately seventy-five dollars’ worth of crack cocaine.
(footnote: 9)  

Several weeks later, they called Appellant again, wanting to purchase more drugs.  Appellant met them at a different motel.  When Appellant arrived, the woman asked him if he was still ready to get his car window fixed.  Appellant replied that he was; therefore, they went to South Oak Cliff High School.  Appellant testified that he let the woman drive his car because she had called in the order and was going to pay for it.  Appellant drove a friend’s car. At the high school, a man arrived and fixed the windshield of Appellant’s car. The woman then paid him with a check.  Appellant stated that the woman must have left Erica Ayers’s check and driver’s license in his car sometime that day. 

On January 27, 2004, Appellant was arrested at his girlfriend’s house. Appellant testified that the jacket and one of the blue baseball caps found in the search of the house belonged to him and that it was what he was wearing at the Chevron station when he had attempted to use Shambo’s debit card.  He testified that it was not uncommon for him to own a plain blue baseball cap; in fact, over half of the people in his family had identical baseball caps.  Appellant did acknowledge, however, that the cap looked a lot like the cap that the man was wearing in the photographs of the robberies.   

With regard to the other blue baseball cap found in the search, Appellant testified that it did not belong to him.  Furthermore, he did not know to whom the bulletproof vest belonged.  He stated that his girlfriend, his girlfriend’s brother Paul Brown, and his girlfriend’s sister-in-law all also had access to the house.  Moreover, Appellant stated that he did not know anything about the handgun found in the car. 

Finally, Appellant testified that, unlike him, the man wearing the blue cap in the photographs of the robberies did not have long hair.  Appellant stated that during December 2003 and January 2004, he wore his hair in braids.  Ultimately, Appellant testified that on both days at about the time the robberies were occurring, he was in Dallas selling drugs. 

III. Extraneous Offense Evidence

Unindicted Robberies

In his first three points, Appellant contends that the trial court erred in allowing extraneous offense evidence relating to the unindicted aggravated robberies at Jessie Brice’s apartment, the Exel Inn, and the EZ Check 525 in violation of Texas Rules of Evidence 404(b) and 403. 

Appellant filed a motion in limine regarding, among other things, the three unindicted offenses in question.  At the pretrial hearing on the motion, Appellant argued that the evidence of the unindicted robberies was inadmissible and asked the court to grant the motion in limine because allowing the evidence “would allow the State to avoid having to indict a weak case just by kind of bootstrapping it to stronger cases and using it to find him guilty anyway” and because the prejudicial effect of the evidence outweighed the probative value. The trial court specifically denied the motion with regard to the three unindicted offenses. 

To the extent that Appellant contends that this motion and hearing preserved any error, we disagree.  The denial of a motion in limine is not sufficient to preserve error for review; Appellant must have objected on the proper grounds when the evidence was offered during trial. 
 Harrington v. State
, 547 S.W.2d 616, 620 (Tex. Crim. App. 1977); 
Scherl v. State
, 7 S.W.3d 650, 654 (Tex. App.—Texarkana 1999, pet. ref’d). 

At trial, an objection must be made as soon as the basis for the objection becomes apparent.  
Tex. R. Evid.
 103(a)(1);
 Lagrone v. State
, 942 S.W.2d 602, 618 (Tex. Crim. App.), 
cert. denied
, 522 U.S. 917 (1997); 
Polk v. State
, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987).  
Further, to preserve error, a party must continue to object each time the objectionable evidence is offered.  
Fuentes v. State
, 991 S.W.2d 267, 273 (Tex. Crim. App.), 
cert. denied,
 528 U.S. 1026 (1999); 
Ethington v. State
, 819 S.W.2d 854, 858-59 (Tex. Crim. App. 1991).  A trial court’s erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling.  
Leday v. State
, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); 
Johnson
 
v. State
, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), 
cert. denied
, 501 U.S. 1259 (1991),
 overruled on other grounds by Heitman v. State
, 815 S.W.2d 681 (Tex. Crim. App. 1991).  This rule applies whether the other evidence was introduced by the defendant or the State.  
Leday
, 983 S.W.2d at 718.

Here, as the State points out, Appellant did not make a Rule 404(b) or a Rule 403 objection to Jessie Brice’s testimony describing the unindicted robbery at his apartment, Bernest Lott’s testimony describing the unindicted robbery at the Exel Inn, Golam Haider’s testimony describing the unindicted robbery at the EZ Check 525, or police investigators’ testimony mentioning the unindicted robberies.  Thus, he has forfeited his complaint that this testimonial evidence violated Rule 404(b) and Rule 403.  
See 
Tex. R. App. P.
 33.1(a). 

Appellant did object on relevance grounds to the admission of the video recordings of the robberies at both the Exel Inn and the EZ Check 525, because the recordings related to unindicted offenses.  However, immediately following the admission of the video recording of the robbery at the Exel Inn, Bernest Lott described the armed robbery in detail without any objection.  Likewise, immediately before the admission of the video recording of the armed robbery at the EZ Check 525, Golam Haider described the armed robbery in detail without Appellant’s making a Rule 404(b) or Rule 403 objection.  Therefore, Appellant has forfeited his complaint that the two video recordings violated Rule 404(b) and Rule 403.  
See
 
Leday
, 983 S.W.2d at 718; 
Johnson
, 803 S.W.2d at 291
. 
     

Finally, Appellant made a general relevance objection to State’s Exhibits 2, 3, and 4, photographs taken from the videos of the robberies at the Exel Inn and the EZ Check 525.  As stated previously, the robberies depicted in these pictures had been described in detail without a Rule 404(b) or Rule 403 objection.  Furthermore, the court of criminal appeals has made it clear that a general relevancy objection at trial does not preserve error concerning a Rule 404(b) extraneous offense claim.  
See Medina v. State
, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1102 (2000) (holding that a relevancy trial objection did not preserve error concerning a Rule 404 extraneous offense claim);
 Camacho
 
v. State
, 864 S.W.2d 524, 533 (Tex. Crim. App. 1993), 
cert. denied
, 510 U.S. 1215 (1994) 
(holding that hearsay and relevancy trial objections did not preserve a Rule 404(b) extraneous offense claim on appeal).  Moreover, a Rule 403 objection is not implicitly contained within a relevancy objection; rather, a separate Rule 403 objection must be lodged to preserve error.  
Montgomery v. State
, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh’g); 
Schultze v. State
, 177 S.W.3d 26, 40 (Tex. App.—Houston [1st
 Dist.] 2005, pet. ref’d).  

Therefore, because Appellant 
failed to make the proper objections at trial, we overrule Appellant’s first three points.

Bulletproof Vest

In his fourth point, Appellant contends that the trial court erred in admitting extraneous offense evidence of a bulletproof vest in violation of Texas Rules of Evidence 404(b) and 403. 

When the State offered the bulletproof vest into evidence, Appellant objected that it was not relevant.  The trial court overruled the objection and admitted the vest into evidence.  No other objections regarding the bulletproof vest were made.
  

An objection stating one legal theory may not be used to support a different legal theory on appeal.  
Chambers v. State
, 903 S.W.2d 21, 32 (Tex. Crim. App. 1995); 
Camacho
, 864 S.W.2d at 533
.  
And as previously stated, a general relevance objection at trial does not preserve a Rule 404(b) extraneous offense claim.  
See Medina
, 7 S.W.3d at 643
;
 Camacho
, 864 S.W.2d at 533.  Moreover, as stated, a Rule 403 objection is not implicitly contained within a relevancy objection; rather, a separate Rule 403 objection must be lodged to preserve error.  
Montgomery
, 810 S.W.2d at 388; 
Schultze
, 177 S.W.3d at 40
.  Appellant failed to make the proper objections at trial; therefore, 
we overrule his fourth point.

IV. Legal and Factual Sufficiency

In his fifth and sixth points, Appellant contends that the evidence is legally and factually insufficient to support his conviction.

Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  
This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  
The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
  
A factual sufficiency review of circumstantial evidence is the same as a review of direct evidence.  
King v. State
, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); 
Kutzner
, 994 S.W.2d at 184.

Analysis

Appellant argues that the evidence is legally and factually insufficient to prove that he committed the two aggravated robberies of which he was convicted.  We disagree.

The trial court’s charge in both cases instructed the jury that Appellant could be found guilty of the offense either as the principal or as a party.  In both cases the jury returned a general verdict of guilty.  The guilty verdict will be upheld if the evidence is sufficient under any one of the theories submitted.  
Swearingen v. State
, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003); 
Rabbani v. State
, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992), 
cert. denied
, 509 U.S. 926 (1993).

A person commits the offense of aggravated robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and uses or exhibits a deadly weapon.  
Tex. Penal Code Ann.
 §§ 29.02(a)(2), 29.03(a)(2) (Vernon 2003).  A person is criminally responsible for an offense as a party if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  
Id.
 § 7.02(a)(2).

Viewed in the light most favorable to the verdict, the evidence shows as follows.
(footnote: 10)  Jessie Brice identified Appellant as one of the men involved in the armed robbery at his apartment.  He further testified that Appellant was dressed similarly to the man behind the cash register in State’s Exhibits 2, 3, and 4, photographs taken from the videos of the armed robberies at the Exel Inn and the EZ Check 525.  Eric Pettigrew, a witness to the armed robbery at the EZ Check 811, stated that the man behind the counter in State’s Exhibits 2, 3, and 4 appeared to be the same man behind the counter at the EZ Check 811 and that the way the individuals were dressed in State’s Exhibit 2 was “exactly” what he remembered.  

Appellant was also found to be in possession of property taken during the robberies.  
See Hunt v. State
, No. 05-91-01041-CR to 05-91-01044-CR, 1992 WL 352939, at *3 (Tex. App.—Dallas Nov. 19, 1992, pet. ref’d) (not designated for publication) (“Possession of property may be circumstantial evidence of guilt.”).
 
 Approximately two hours after Guy Shambo’s debit card was stolen at the EZ Check 811 in Denton, Appellant attempted to use the debit card at a Chevron station in Dallas.  Approximately two and a half weeks after Erica Ayers’s purse was stolen at the EZ Check 811, Appellant accompanied a woman to South Oak Cliff High School, where she paid for repairs to his car window with one of Ayers’s stolen checks.  Investigators later inventoried the same car and found a .22-caliber handgun, Ayers’s driver’s license, and another one of Ayers’s checks.  In another search of the car pursuant to a search warrant, investigators found another one of Ayers’s checks and several scratch-off lottery tickets that had been stolen from the CITGO gas station. 

Finally, in the search of the home where Appellant and his girlfriend were living, police investigators recovered two blue baseball caps, one of which Appellant admitted belonged to him.  Detective Ford stated that it is uncommon to find plain blue baseball caps that are not labeled in any way, and Appellant acknowledged that it resembled the cap that one of the men in the pictures of the robberies was wearing.  

In light of the foregoing, we hold that the evidence is legally sufficient to support the verdict that Appellant is guilty of the aggravated robberies of Shambo and Ayers.  We next turn to the factual sufficiency of the evidence. 

In response to the evidence detailed above in support of Appellant’s participation in the robberies of Shambo and Ayers, Appellant testified that on both days at about the time the robberies were occurring, he was in Dallas selling drugs.  He stated that the man wearing the blue cap in the pictures of the robberies did not have long hair; whereas, he had long hair at the time and wore his hair in braids.  Furthermore, Appellant testified that it would not be uncommon for him to own a plain blue baseball cap; in fact, over half of the people in his family had identical baseball caps. 

Appellant also gave an explanation for having the stolen property in his possession.  He testified that through his drug dealing with Smurf, he came into possession of the stolen lottery tickets from the CITGO store, Erica Ayers’s driver’s license, her checks, and Guy Shambo’s debit card.  Furthermore, Appellant claimed he had no knowledge of the gun that was found in his car. 

As previously stated, 
in performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Zuniga
, 144 S.W.3d at 481; 
Cain
, 958 S.W.2d at 407.  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482. 
 Therefore, viewing the evidence in a neutral light, we cannot say that the evidence supporting the verdict is too weak to support the finding of guilty beyond a reasonable doubt or that the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
See Zuniga
, 144 S.W.3d at 484-85.
  We overrule Appellant’s fifth and sixth points.

V. Conclusion

Having overruled Appellant’s six points on appeal, we affirm the trial court’s judgments.

ANNE GARDNER

JUSTICE

PANEL F: DAUPHINOT, HOLMAN, and GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  April 6, 2006

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
Areanas stated that he thought the gun was a revolver. 

3:
Haider’s wallet was not taken, however, because he had no money in it. 

4:
It was later discovered that the car was registered to Appellant’s grandmother. 

5:
Detective Ford testified that, based on his recollection, the gun was a revolver, but it could have been an automatic.  Unfortunately, by the time of trial, the gun had been destroyed. 

6:
Detective Smith and Investigator Benny Parkey, also of the Denton Police Department, testified that the robberies were investigated together because they were believed to be related.  

7:
Detective Ford also testified, however, that none of the participants in any of the robberies were described as wearing a bulletproof vest.  

8:
Three of the other stolen tickets were cashed in Denton the morning after they were stolen. 

9:
Appellant testified that the woman told him it would cost anywhere from two hundred to three hundred dollars to have the glass fixed, and Appellant agreed to give them half of that amount in drugs that night. 

10:
Appellant appears to argue that we may only consider evidence of guilt presented by the State in a legal sufficiency review.  However, we are to consider 
all
 the evidence that sustains the conviction, whether submitted by the prosecution or defense, in determining the legal sufficiency of the evidence.  
Clewis v. State
, 922 S.W.2d 126, 132 n.10 (Tex. Crim. App. 1996);
 Cook v. State
, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993); 
Adams v. State
, 180 S.W.3d 386, 413 (Tex. App.—Corpus Christi 2005, no pet.)
.